**TEXAS & PACIFIC RY. CO. et al. v. SON-KEN-GALAMBA CORPORATION.**

No. 8650.

Circuit Court of Appeals, Fifth Circuit.

Dec. 1, 1938.

Robert Thompson, of Dallas, Tex., William D. Smith and Frank J. Wren, both of Fort Worth, Tex., and G. B. Ross, of Galveston, Tex., for appellants.

Benj. L. Bird, of Fort Worth, Tex., and I. J. Ringolsky, Harry L. Jacobs, and Wm. G. Boatright, all of Kansas City, Mo., for appellee.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

Mandamus action was brought by Son-ken-Galamba Corporation, appellee, against Texas and Pacific Railway Company and others, appellants, to compel them to receive and transport certain steel and iron material at the rate specified, published and approved by the Interstate Commerce Commission for "Scrap Iron, Scrap Steel, Borings, Filings or Turnings". The appellants, carriers, refused to accept and ship said steel and iron material at the tariff rate fixed and insisted upon a rate which was much higher, the same being for "Iron and Steel Articles".

The tendered loadings of steel and iron material consisted of dismantled oil tanks and emanated from two points in Texas known as Wickett and Wink. Two thousand tons were tendered the carriers as scrap iron and a further amount of fifteen to twenty thousand tons from the same vicinity and of the "identical material" is involved in this suit, as the scrap iron rate for the entire amount was sought.

The case was heard before the United States District Court for the Northern District of Texas. A jury found the issues

in favor of Sonken-Galamba Corporation, appellee, and from such finding and judgment, Texas and Pacific Railway Company and others, appellants, appeal.

There is no merit in the contention of appellants that we have here a question of rate making, and that it should be decided by the Interstate Commerce Commission. That body has long ago fixed and published the rate on scrap iron. Such rate is plain and unambiguous. Not only has the Interstate Commerce Commission fixed and prescribed the rate on scrap iron but in so doing has interpreted it and prescribed the simple test by which shipper, carrier, and courts were to determine its applicability: "Scrap Iron, Scrap Steel, Borings, Filings or Turnings (Iron or Steel), subject to Note 1 * * * Note 1.—Rates on Scrap Iron or Scrap Steel apply only on pieces (separate or combined) of iron or steel having value for remelting purposes only."

Where the tariff provision does not depend for its meaning upon the solution of some peculiar question of fact; where the reasonableness of the provisions is not in issue; where the Commission has concededly promulgated a rate which must be applied; and where the only question is whether or not the commodity in question is the commodity referred to in the rate, then there is presented a factual question in no wise differing from any other fact issue determinable by courts and juries. Whether a certain grain is wheat, a certain article of apparel an overcoat, a certain mineral gold, as such terms are ordinarily used, can and should be answered by the usual triers of facts. The courts have original jurisdiction to try these issues. Atchison, T. & S. F. Ry. Co. v. U. S. ex rel. Sonken-Galamba Corporation, 8 Cir., 98 F.2d 457; Macon, D. & S. R. Co. v. General Reduction Co., 5 Cir., 44 F. 2d 499; American Ry. Exp. Co., Inc., v. Price Bros., Inc., 5 Cir., 54 F.2d 67.

Strip away the mass of immaterial evidence we have here, state the issue, and we find that decision turns upon a simple question of fact: (1) Did the two thousand tons tendered the carriers and the fifteen to twenty thousand tons to be tendered, of steel and iron material, consist of "Scrap Iron, Scrap Steel, Borings, Filings or Turnings"? and (2) Did such material have a commercial value save and except for remelting purposes only?

The evidence shows that the iron and steel material came from dismantled oil tanks purchased in May, 1935 by appellee. These tanks had contained "sour oil," that is, oil having a sulphur content; the sulphur causing a chemical reaction and penetration of the iron and steel making it unfit for reweld. The tanks had a capacity of from fifty five thousand to eighty thousand barrels of oil, and when new cost from twenty to thirty thousand dollars. The tanks were purchased by the appellee after they had been used in the "sour" oil field for about eight years. The price paid was from two to three dollars per ton or from two hundred and fifty to seven hundred and fifty dollars per tank. The material was corroded, being pitted and having holes in it from the size of a pin to a size sufficiently large for one's thumb to be inserted. The oil company sold and the appellee bought the tanks for junk, and when the tanks were wrecked the pieces were resold for export as scrap.

The evidence further showed that in wrecking the oil tanks in question a line was hooked to the roof of the tanks and they were dragged off; then a scaffold was erected inside the tanks and the rivets were sheared off by an air "rivet buster", many of the round rivet holes being torn, distorted and elongated in the process of dismantling. The evidence was in sharp conflict as to the condition of the tanks' with reference to corrosion from the sulphur content; the evidence of appellee, however, comes to the fore with a preponderance that discloses that it sought out buyers of the material, but found no opportunity to sell the same as second-hand material or for commercial purposes; that it was scrap iron and only fit for remelting.

Many assignments of error as to pleading and evidence are to be found in the record. We have carefully considered each assignment and find no error prejudicial. No good purpose could be served by discussing them seriatim.

The learned trial judge submitted to the jury the issues fully and fairly, and we find no error in this regard.

The judgment is affirmed.