SONKEN-GALAMBA CORPORATION al. v. ATCHISON, T. & S. F. RY. CO. et al.

No. 124.

District Court, W. D. Missouri, W. D.

July 3, 1940.

Ringolsky, Boatright & Jacobs, William G. Boatright, Harry L. Jacobs, Charles A. Whitebook, and Bernard L. Glover, all of Kansas City, Mo., for plaintiffs.

R. S. Outlaw, of Chicago, Ill., Lathrop, Crane, Reynolds, Sawyer & Mersereau, Cyrus Crane, George J. Mersereau, and Dean Wood, all of Kansas City, Mo., for Atchison, T. & S. F. Ry. Co.

Hobart Price, of Dallas, Tex., Carl S. Hoffman and C. S. Burg, both of St. Louis, Mo., and E. A. Neel (of Cooper, Neel & Sutherland), of Kansas City, Mo., for Missouri-Kansas-Texas R. Co. and Missouri-Kansas-Texas R. Co. of Texas.

Robert Payne and G. M. Hodges, both of Dallas, Tex., for Texas & P. R. Co.

Guernsey Orcutt and Edward A. Kaier, both of Chicago, Ill., for Pennsylvania R. Co.

Charles J. Kelly, of Denver, Colo., for Western Weighing & Inspection Bureau.

OTIS, District Judge.

This is a suit for damages alleged to have been caused plaintiffs by the refusal of defendant railroad companies to transport at the scrap iron and scrap steel rate metal from dismantled oil tanks tendered by plaintiffs for shipment. Plaintiffs had acquired old oil tanks, no longer useful in situ for the purposes for which they were erected, intending to dismantle them and to sell the pieces of metal so obtained for the best prices they could get, contemplating that the material would be transported at scrap steel rates. The railroads, contending the material took a higher rate, refused to carry it except at the higher rate. This suit for damages resulted. Its statutory basis is Section 8 of Title 49, U.S.Code, 49 U.S.C.A. § 8.

In the background are three proceedings in mandamus in each of which the principal question involved was identical with the principal question involved in this case and each of which the plaintiff, Sonken-Galamba Corporation, won. The first was instituted by Sonken-Galamba Corporation March 17, 1937, in the United States District Court for the Northern District of Texas before Judge Wilson. By that proceeding Sonken-Galamba Corporation sought to compel certain railroads, including defendant Texas & Pacific Railway Company, to carry pieces of steel from dismantled oil tanks at scrap rates. The principal issue was whether what had been tendered for shipment consisted of "pieces * * * of * * * steel having value for remelting purposes only." It was conceded that such was the test. That issue, on the evidence introduced, was resolved in favor of the shipper. The alternative writ of mandamus, issued March 17, 1937, was made peremptory April 6, 1937. The material tendered was carried at the scrap rate. The judgment of the district court was affirmed by the Court of Appeals for the Fifth Circuit. 100 F.2d 158.

The second mandamus proceeding (second in that it was submitted and decided after the Texas case) was instituted by Sonken-Galamba Corporation March 15, 1937, in the United States District Court for the Western District of Missouri (Judge Otis presiding) against the Kansas City Southern Railway Company (not a defendant in this case). The principal issue was identical with the principal issue in the Texas case. It was similarly resolved. The alternative writ issued on March 15, 1937, was made peremptory April 20, 1937. There was no appeal.

The third mandamus proceeding was instituted by Sonken-Galamba Corporation April 28, 1937, in the United States Dis-

trict Court for the Western District of Missouri (Judge Reeves presiding) against Missouri-Kansas-Texas Railroad Company, the Atchison, Topeka & Santa Fe Railway Company, Missouri-Kansas-Texas Railway Company of Texas, defendants here, and other railway companies. The principal issue was identical with the principal issue in the Texas case. It was similarly resolved. The alternative writ which issued on April 28, 1937, was made peremptory July 2, 1937. United States ex rel. Sonken-Galamba Corp., D.C., 21 F. Supp. 931. The judgment was affirmed by the Court of Appeals for the Eighth Circuit. Atchison, T. & S. F. R. Co. v. United States ex rel. Sonken-Galamba Corp., 98 F.2d 457.

Three times therefore (not to speak of certain other litigation) Sonken-Galamba Corporation had won out against railroads in its controversy with them as to the proper classification of pieces of steel from dismantled oil tanks. Three federal district judges (one of them the writer of this memorandum) had decided, on the evidence submitted, that the material offered for transportation, was entitled to be carried at the scrap iron and scrap steel rate. Two of these judgments had been affirmed. So fortified the plaintiffs instituted this suit for damages.

The quantum of evidence offered at each of the mandamus proceedings relatively was small. That was not the case, however, at the trial of this suit for damages. With possibly one exception the trial was the longest in the history of this court. Thirty-three days were required for the trial proper and many days were devoted to preliminary matters. The transcript of testimony fills 4,568 pages. There were 683 exhibits. Depositions taken in many states, in Mexico and Canada, in China and Japan, were read in evidence. The oral argument consumed two days. The thorough and scholarly briefs submitted filled hundreds of pages. It should be easily conceivable that the weight of the evidence offered at a trial of such duration involving such volume of testimony and exhibits might well be on a different side of an identical issue than it was at trials requiring only a few days. Exactly that has happened.

It has seemed to me that I best can serve the litigants and reviewing courts if I confine my work now to formal findings of fact, formal conclusions of law, and a brief statement of what I conceive to be the chiefly controverted questions of law, and of my views with respect to those questions.

I make the following formal findings of fact:

I. Plaintiff, Sonken-Galamba Corporation, is and at all times involved was, engaged chiefly in the business of buying and selling scrap metal and waste material. Plaintiff, the Tank Corporation, was associated with Sonken-Galamba Corporation in buying and selling metal plates from dismantled oil tanks and tanks to be dismantled. The defendants are and were railroad corporations engaged as common carriers in interstate commerce.

II. Plaintiffs acquired quantities of oil tanks, no longer, for various reasons, useful in situ as oil tanks to their owners. Some were rendered useless as oil tanks by deterioration, some by obsolescence, some by exhaustion of oil fields. Plaintiffs acquired them for a small fraction of the original cost of the completed tanks, intending to dismantle them and to sell the pieces of metal recovered in the best market and for the best prices obtainable.

III. With exceptions (the exceptions chiefly were made up of pieces of metal recovered from the floors and roofs of tanks) the pieces of metal recovered from dismantled tanks generally were rectangular. As originally manufactured they were perforated around the edges so they could be fastened together by rivets. In dismantling, the rivet heads were cut off by an instrument operated by power by a blow delivered against the side of the rivet head, which in some cases destroyed the rivet hole (making it a slit in the plate), and which in other cases somewhat elongated the hole (not generally to such an extent that it would no longer serve its original function.) Generally (but not always) the tanks acquired by and for plaintiffs were dismantled by dropping to the ground first the top ring of plates, then the second ring, and so on. As the plates fell upon the ground or upon previously fallen plates often (but not always) they were bent and somewhat distorted from their original form.

IV. In addition to the effect upon the form of plates and rivet holes resulting from the method of dismantling followed by and for plaintiffs, the plates recovered, in a great number of instances, were eaten

into by corrosion, by rust, by exposure to the elements, were deeply pitted and sometimes perforated by corrosion. On the other hand, also in a great number of instances, the plates recovered (while all were somewhat rusted and weather worn) were not perforated nor deeply pitted nor materially corroded. It is impossible to determine from the evidence what percentage of all of plaintiffs' plates fell in the first of these classes and what percentage fell in the second of these classes. It is impossible from the evidence to determine, as a matter of fact (setting aside res adjudicata referred to in findings of fact Nos. VIII and IX) as to any given segregated collection of plaintiffs' plates, what percentage thereof fell in the first and what percentage fell in the second of these classes.

V. Of the plates recovered from dismantled oil tanks, great quantities were remelted and were of value for remelting purposes only. Great quantities were used and were of value for purposes other than remelting: (a) for building oil tanks; (b) for constructing various kinds of storage receptacles; (c) for constructing feeding floors, building culverts, making runways, damming creeks; (d) for raw material (without remelting) for tools (chiefly an Oriental use). It is impossible from the evidence to determine what percentage of the whole mass of metal recovered and recoverable from oil tanks was or could be used and was of value for these other than remelting purposes.

VI. Plaintiffs consistently and continuously represented that the plates they had recovered from dismantled oil tanks were useful and of value for all purposes for which new plates could be used. They so advertised their plates in trade magazines, in periodicals and newspapers, in letters and orally.

VII. The plaintiffs contended that the lawful rate for the carriage of such plates from dismantled oil tanks as they tendered and intended to tender for transportation by railroad was the scrap iron and scrap steel rate. Some railroads, including defendants, contended, as to plates tendered or exhibited, that a higher and different rate applied.

VIII. As to one particular quantity of plates tendered for shipment to the defendant Texas & Pacific Railway Company (and other railroads not now defendants) by plaintiff Sonken-Galamba Corporation, Sonken-Galamba Corporation brought a mandamus proceeding in the United States District Court for the Northern District of Texas to compel the railroads to carry the quantity so tendered at the scrap rate. Mandamus was granted. The shipment tendered was carried at the scrap rate. The petition for mandamus was filed March 17, 1937. Judgment granting the peremptory writ was on April 6, 1937. Judgment affirmed, 5 Cir., 100 F.2d 158.

IX. As to another particular quantity of plates tendered for shipment to defendants Missouri-Kansas-Texas Railroad Company, the Atchison, Topeka & Santa Fe Railway Company, and the Missouri-Kansas-Texas Railroad Company of Texas (others not now parties were named as defendants in the mandamus proceeding) by Sonken-Galamba Corporation, Sonken-Galamba Corporation brought a mandamus proceeding in the United States District Court for the Western District of Missouri April 28, 1937. An alternative writ was granted on the same day and made peremptory July 2, 1937. 21 F.Supp. 931. The shipment tendered was carried at the scrap rate. Judgment affirmed, 8 Cir., 98 F.2d 457.

X. The Western Weighing & Inspection Bureau, an unincorporated association, originally brought into being by western railroad companies and maintained by them, served member railroads, including defendants, by considering rating questions submitted to it, by investigating upon request how particular items should be classified and what freight rates were applicable, and by advising member railroads as to its decision. No member railroad was bound to accept the decision of the Bureau and there was no agreement of any kind between member railroads that the decision of the Bureau as to the proper rate to be applied to any shipment or tendered shipment would be accepted. The service was advisory only. The Western Weighing & Inspection Bureau ruled that the scrap iron and steel rate did not apply to such proffered shipments by plaintiffs of plates from dismantled oil tanks as it was consulted about by the railroad companies, including the defendants.

XI. No evidence in the case justifies a conclusion that there was any conspiracy or agreement of any kind between any railroad companies, to which conspiracy or agreement any defendant company was a party, that plates from dismantled oil tanks

tendered for shipment by plaintiffs or any other would not be transported at the scrap iron or scrap steel rate.

XII. There was not tendered by plaintiffs to any defendant company for transportation any quantity of plates from dismantled oil tanks of as much as 75,000 pounds in weight (excepting the tenders involved in the mandamus suits referred to in findings of fact Nos. VIII and IX) which was made up of "pieces of iron or steel having value for remelting purposes only."

XIII. Plaintiffs have sustained no damages.

The necessary conclusions of law are two. I state them as follows:

### Conclusions of Law

I. This court has jurisdiction of this case for that it arises under the laws of the United States and involves more than $3,000 exclusive of interest and costs.

II. Upon the facts found, plaintiffs are not entitled to recover damages in any amount from the defendants or any of them.

### Concerning Certain Controverted Matters

It has seemed to me that plaintiffs' learned counsel have relied upon several somewhat daring theories, none of which likely would have been conceived save by a lawyer of unusual talent or by any lawyer in a case in which he has found himself, as it were, almost in extremis. These theories have been urged with great ability and learning. I have not been convinced but I am far from saying that other and wiser judges may not be convinced.

1. In the beginning plaintiffs' counsel maintained the theory that all the issues, except that of damages, were res adjudicata, by reason of the judgments rendered in the mandamus proceedings. They submitted their theory by a motion for summary judgment. It was ruled against them. All that I have to say on the subject I did say in my opinion. 28 F.Supp. 456. In that opinion I set out also the reasons on account of which certain defendants originally joined were dismissed from the proceeding and the reasons on account of which certain elements of damages claimed were adjudged irrecoverable. I do not now enlarge upon that opinion.

2. Whether the pieces of steel tendered by plaintiffs to any defendant for shipment were scrap steel within the meaning of the railroad tariffs and entitled to be carried at the scrap steel and scrap iron rate, involves the following tariff provision:

"Scrap iron, scrap steel, borings, filings or turnings (iron or steel) subject to Note 1 minimum weight 75,000 pounds * * *

"Note 1.—Rates on scrap iron or scrap steel apply only on pieces (separate or combined) of iron or steel having value for remelting purposes only."

Plaintiffs' counsel maintain that Note 1 is not determinative of what constitutes scrap iron and scrap steel entitled to the scrap iron and scrap steel rate. Their position is that the tariffs set out numerous specific articles and the rate as to each of such articles. For example, there is a rate for "tanks k. d." (tanks knocked down) and there is a rate for "plates." Counsel maintain that if given pieces of steel proffered for shipment are no one of the specific articles mentioned in the tariffs, that is, if they are not "tanks k. d." or "plates" or some other article specifically mentioned, then they are scrap and entitled to the scrap rate, even although they may be "of value for other than remelting purposes."

I think counsel are wrong in this theory. No controlling decision supports it. The theory is wrong because it directly conflicts with the express language of Note 1. That note declares that the rates on scrap iron or scrap steel shall "apply only on pieces (separate or combined) of iron or steel having value for remelting purposes only." Here is an express provision that scrap iron or scrap steel rates shall not apply except on pieces of iron or steel having value for remelting purposes only. Note 1, therefore, is determinative, not merely, as counsel suggest, an aid when another and primary test has failed.

3. Without regard to whether Note 1 is determinative or merely an aid, a related controversy between the parties is whether the pieces of steel tendered for shipment by plaintiffs were "plates," an item specifically mentioned in the tariffs. Some of defendants at least (if not all of them) contend that some of the pieces of steel tendered for shipment were "plates." Plaintiffs' counsel assert that none were "plates." In my judgment, counsel for plaintiffs have erred in this contention. It is bottomed upon the strained literalness

with which they interpret the definition of "plate." "A plate," say counsel, quoting the Century Dictionary, "is a sheet of metal of uniform thickness and even surface." They argue: If what undoubtedly originally was a plate is exposed to weather and chemical action so that it has become pitted, it no longer has an "even" surface and therefore no longer is a "plate," not even a secondhand plate. But this, as I think, with all due respect, is a mere play upon an exaggerated interpretation of words. Certainly a pitting of a plate which does not affect its functioning does. not change its character from a "plate" to something nondescript. Beneath a glass the smoothest plate will appear full of elevations and depressions and the sharpest razor look like a saw.

4. The tariff provides that the scrap iron and scrap steel rates shall apply only "on pieces (separate or combined) of iron or steel having value for remelting purposes only." The parties do not agree touching the interpretation to be given the word "value" in this provision. Plaintiffs' learned counsel assert, there is authority for the position, that the word "value" is to be interpreted as meaning "recognized commercial value." The Interstate Commerce Commission has said as much and the phrase "recognized commercial value" is used in some of the opinions of the courts, although never, so far as I have been able to discover, in a decision of any controversy concerning the meaning of the word "value." Counsel seize upon the phrase "recognized commercial value," take it apart, subject each word to exegesis, and build up a complex structure of interpretation that in my judgment is not warranted. The argument leads to such results as this: "Commercial value" means value in commerce; commerce means interstate commerce (for Congress can regulate interstate commerce only); hence, although there may be an established market for secondhand steel plates in Oklahoma, they have no "commercial value" unless they sell as plates in interstate commerce. And to such results as this: "Recognized commercial value" means a value which is recognized, not merely in one county, or one state, or one section, but nationally, or at least in several sections of the nation. And to this: The "value" must be on account of some use in the United States (as if a demand in China might not give value here). Thus

such a simple word as "value" is enlarged and imbued with distinctions and superdistinctions until no one, who does not have the mind of the profoundest physicist, can tell what it means. One is tempted to believe that only a sense of the weakness of their case would lead able counsel to such intricate ratiocination.

It is entirely possible, of course, that counsel are right. But I do not think they are right. In my judgment all that is meant by "value" in the clause—"rates on scrap iron or scrap steel apply only on pieces (separate or combined) of iron or steel having value for remelting purposes only"—is money value (not a merely sentimental value) on some market (not a value only to a present owner), a value that is recognized, that is, that is known or easily ascertainable to dealers at that market.

5. There is a final point of fundamental controversy between the parties. Plaintiffs' counsel, now recognizing, as they are compelled to do by the record here, that immense quantities of secondhand plates from dismantled oil tanks actually were used and of value for other than remelting purposes, boldly espouse the theory, denied by defendants, that the unit to be considered in determining whether pieces of metal from dismantled oil tanks are of value for other than remelting purposes is not some single carload which is tendered for shipment at some given point on a line of railroad, but the whole mass of such material available in the country. Fully recognizing that as to any given carload it might well be said that, in the locality where it is tendered for shipment, it does have a value for other than remelting purposes, the contention is that if all the material of the kind in the country as a whole is considered and the national demand and the national market are considered, then the material has no recognized commercial value except for remelting purposes.

There is force in their theory. Indeed I adopted it, by way of dictum, in that one of the three mandamus proceedings which was tried before me. I have seen a transcript of my oral opinion, not published. Reflection has convinced me that I was wrong in the view I then announced incidentally and that learned counsel for plaintiffs are wrong now. The unit to be considered is not the whole mass of secondhand plates from dismantled oil tanks

which might be available. When a carload of secondhand plates, exceeding 75,000 pounds in weight, is tendered to a railroad for transportation, that carload is the unit to be considered. That carload is to be distinguished from the great mass in the fields or as yet in tanks not dismantled. Upon that carload of plates labor has been expended,—in gathering them, in placing them for shipment, probably in grouping them according to sizes. Sand in the river bed is one thing; sand loaded in a car for shipment is a different thing.

It must be determined from an inspection of the carload of plates tendered for shipment whether, at the place where it is tendered, the pieces of steel it contains are of value for other than remelting purposes. The tariff was intended to be applied in a practical fashion by laymen. It was not intended that before it was applied a nation wide study must be made, that it must be ascertained what amount of such material was available in the country, what the national demand for other than remelting purposes is and then that the national supply should be weighed against the national demand.

### Burden of Proof

Undoubtedly immense quantities of secondhand plates from dismantled oil tanks which plaintiffs had acquired were no more than junk and scrap, of value only for remelting purposes. In the mandamus proceedings the evidence convinced the judges that what was there involved was of this character. The record now presented shows, however, that immense quantities, perhaps the greater part, of the secondhand plates which the plaintiffs acquired were of value for other than remelting purposes.

Certainly if more than 75,000 pounds of what was no more than junk and scrap, of value only for remelting purposes, were loaded in a freight car and tendered for shipment, it was the duty of the railroad to which it was tendered to apply the scrap iron and scrap steel rate. Equally certainly if a carload was half filled with secondhand plates that were of no value except for remelting and half filled with secondhand plates that were of value for other than remelting purposes, a total weight of 75,000 pounds, no railroad would be obliged to carry it at the scrap rate.

The burden of proof was upon the plaintiffs to show that what was tendered was entitled to the scrap rate. I have found it impossible to say that the plaintiffs have sustained that burden as to any carload of this material tendered by them, excepting those quantities that were involved in the mandamus proceedings. As to the quantities involved in the mandamus proceedings, they were carried at the scrap rate. Plaintiffs were not damaged by the refusal of the railroads to carry those quantities at the scrap rate, except as they were damaged by the necessity of bringing and prosecuting proceedings in mandamus. Those damages, however, I have ruled, are not recoverable in this case.

### Judgment

This cause coming on to be heard before the court, trial by jury not having been demanded, and the court having considered the pleadings, the evidence introduced, the written and oral argument of counsel, having made findings of fact and announced conclusions of law, and being fully advised in the premises:

Now, therefore, it is ordered, adjudged and decreed that the plaintiffs recover nothing from the defendants in damages and that the costs be assessed against plaintiffs.