**MURRAY CO. et al. v. GULF, C. & S. F.**
**RY. CO. et al.**

Civ. No. 1263.

District Court, N. D. Texas,
Dallas Division.

March 14, 1945.

Frank C. Brooks (of Callaway & Reed), and Reuben Williams, all of Dallas, Tex., for plaintiffs.

Joe M. Burford, Allen Charlton, Robertson, Leachman, Payne, Gardere & Lancaster, Touchstone, Wight, Gormley & Touchstone, and W. P. Donalson, all of Dallas, Tex., Baker, Botts, Andrews & Wharton, of Houston, Tex., Terry, Cavin & Mills, of Galveston, Tex., and Wren & Jeffrey, of Fort Worth, Tex., for defendants.

ATWELL, District Judge.

The suit is for the collection of, what the plaintiff claims to be, excessive charges on various shipments of "twisted or coiled" steel bars. The defendant railways assert that what was shipped were "bomb bodies," or "bomb body parts."

The articles, at a little distance, look like metal cylinders about three inches in diameter. Upon closer inspection they appear to be a closely woven, or coiled, rather heavy square rod so that it makes a cylinder about thirteen inches long with each end of the rod, or metal, shaped or sheared down so that it is substantially flat and fits on to that particular end so that each end appears to be level.

These metal forms are made outside of Texas and shipped into this jurisdiction for the placing, therein of certain explosives and machinery so that when the entity is dropped, or fired, or discharged, it explodes and scatters the shattered surrounding metal, which forms the shell, and which wounds and destroys and kills.

One of the definitions of "twist" is "to alter in shape, as by turning the ends in opposite directions, so that parts previously in the same straight line and plane, are located in a spiral curve;" "to form into a coil, knot, or the like, by winding, rolling, etc.;" "to curve or bend in any way;" "to twist around or about one's little finger;" "to change shape with a spiral or screwing movement of parts;" "bent or turned awry;" "to wind or curve or bend;" "spiral disposition, arrangement, or form;" "a curve, bend, or turn." "Coil," means "to wind into concentric rings;" "twist," or, "wind spirally." "Concentric," means "having a common center, as circles or spheres."

Even a casual inspection indicates that if the spiral could be unwound and straightened, that it would result in a practically square rod, tapering at each end to a flat, thin terminus. The rod is practically square and about one-half inch broad and high. It appears that at some time during the process of making it into its present conical, or tubular shape, to have been nicely polished and adjusted so that it is rather compact. The "twist," therefore, is not a "twist" which we ordinarily conceive as twisting, as for instance, when one twists a string or a piece of thread to make it more compact, so as to enter a needle, say. The "twisting" that seems to have been done with this rod is

quite orderly so that each new twist or coil results in an exact fitting and juxtaposition as a coil or tube. It is not sufficiently compact to hold water.

Whether this operation and what results can be said to be a "twisted rod" is the open question for determination. If it is, the plaintiff is entitled to recover. If it is not, the defendants are entitled to recover, provided it is a "bomb body," or "bomb body part."

The first defense raises the question of the right of the court to go forward before the I.C.C. has acted.

■ A pure question of fact may be determined by a court. Great Northern v. Merchants Elevator, 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943; Macon, D. & S. R. Co. v. General Reduction Co., 5 Cir., 44 F.2d 499; Crancer v. Lowden, 8 Cir., 121 F.2d 645.

■ The rule seems to be, in this Circuit, Texas & Pacific R. Co. v. Sonken-Galamba, 5 Cir., 100 F.2d 158, that where the Commission has conceded and promulgated a rate which must be applied, and where the only question is whether the commodity is the commodity referred to in the rate, then there is presented a factual question in nowise differing from any other fact issue determinable by courts and juries. Courts have original jurisdiction to try such issues.

■ It is not rate-making. The I.C.C. has not only fixed the rate, but has interpreted it and prescribed the simple test by which shipper, carrier, and courts may determine its applicability. The rate for which each side contends is for a certain article. Is the article a "bomb body," or a "bomb body part;" or, is it a twisted rod? I am inclined to think it is a "bomb body," or a "bomb body part." It is undoubtedly made out of a rod. But it is hardly logical to say that a completed article of commerce continues to be the thing from which it was made. A cotton shirt is made from cotton, but it is no longer classed as cotton. The operations through which the cotton goes are many. Nor are characteristics necessarily determinative. Four legs, a tail, a long neck, ears, eyes and a mouth do not make a horse any more certainly than they make a cow.

If the case of Texas & Pacific R. Co. v. American Tie & Timber Co., 234 U.S. 138, 34 S.Ct. 885, 58 L.Ed. 1255, is the law, the defendants are entitled to recover. See also Great Northern v. Merchants Elevator 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943.

Such actions as may lie against carriers, or, by carriers, under Secs. 1, 3 and 6, 49 U.S.C.A. §§ 1, 3, 6, are primarily for the I.C.C. because they involve reasonable charges, discrimination and differentials in hauls.

The "election" determined in United States v. Oregon Lumber Co., 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261, does not deal with a statutory election, such as the commerce statute deals with when it says that the "shipper shall elect" where he will seek his remedy—whether before the I.C.C. or whether in court.

On the merits, the question is a little more difficult. In its solution there are certain guides, in addition to statute and decision, that appear to be supported by reason. By the innate ability of the trained beholder he can catalogue correctly that which he sees and understands. Some of those guides are the effect that must be given to the specific as against the generic, to the commodity rather than its classification. To its use, to its name, to its impracticability in any other field than that for which it was fabricated or made.

Likewise, the recovering party must preponderate and satisfy the burden of proof.

The article over which the controversy arises was manufactured in Michigan within specifications furnished by the United States government. Great care and precision is shown to have been practiced in such manufacture, even to the extent of thousandths of an inch in tolerance. The steel rods out of which it was manufactured, dimensioned and shaped had to be of a certain consistency, and when finally completed both by hand and machine, were placed in an orderly manner in box cars and shipped to the plaintiffs at Dallas; they, in each instance, paying the freight. Each of the plaintiffs then performed, in accordance with bids which they had made, for the contracts with the government, certain additional work, painting and fittings to the article. When thus completed it became a bomb.

The testimony indicates that it cannot be used for anything else. It is certainly not a spring. It is certainly not a rod, either twisted or coiled in the crude sense of the dictionary definition, nor in the sense of the ordinary understanding of those

words. It is a part of a bomb—a bomb body—an implement of the War Department for the destruction of human enemies. It is fixed and builded to a nicety with other parts so that its completion is satisfactory and effective.

This classification entitled the defendants to charge $1.08 instead of $.94, as contended by the plaintiffs.

For a few months during such shipments $.94 was charged. The defendants sue, as they are bounden to do, for the recovery of the uncollected portion of the $1.08.

Judgment may go for the defendants on their cross-action, and against the plaintiffs on their action.