## SWIFT & CO. v. UNITED STATES.

(Circuit Court of Appeals; Seventh Circuit. December 5, 1918.)

### No. 2482.

1. CARRIERS ⮞38 — FREIGHT RATES — CARLOADS — PARTIAL UNLOADING IN TRANSIT.

   Under rules contained in the published tariff of a railroad company that (a) "cars containing freight which is waybilled at carload rates will be stopped in transit to complete loading of car or to partly unload contents of car," and (b) "the charge for stopping off cars for the purpose of unloading a portion of the contents, or completing loads, will be $3 per car for each stop," a shipper of a carload to a single consignee at a designated station is not subject to the extra charge of $3 per car, because the consignee unloads portions of the contents at intermediate stations, where the car is not taken from the train.

2. CARRIERS ⮞38—PUBLISHED FREIGHT SCHEDULES—CONSTRUCTION.

   The law compels carriers to publish and post their schedules of charges upon the theory that they will be informative; they are supposed to be expressed in plain terms, and a shipper who consults them has a right to rely upon their obvious meaning.

3. CARRIERS ⮞38—FREIGHT SHIPMENT—CHARACTER OF RATE.

   The character of a freight shipment must be determined at the time the shipment begins and cannot be changed, so far as the application of rates is concerned, by the subsequent conduct of either consignor or consignee.

4. CARRIERS ⮞38—OFFENSES BY CARRIER—CARLOAD SHIPMENTS—RATES.

   A shipper making shipments in carload lots has the right to bill to a single consignee, though the contents of the car may be intended for different individuals.

In Error to the District Court of the United States, for the Eastern Division of the Northern District of Illinois.

Criminal prosecution by the United States against Swift & Co. Judgment of conviction, and defendant brings error. Reversed.

Plaintiff in error, indicted upon 29 counts, was found guilty on all of them and sentenced to pay a fine of $60,000 upon 28 of them, 1 having been dismissed. The charges preferred against it may be divided into two classes. Counts 1 to 25 dealt with section 1 of the Elkins Act (Act Feb. 19, 1903, c. 708, 32 Stat. 847 [Comp. St. § 8597]). The last 4 counts charged plaintiff in error with a violation of section 10 of the act to regulate commerce (Act Feb. 4, 1887, c. 104. 24 Stat. 382 [Comp. St. § 8574]). All the offenses arose out of four shipments.

One of the customers of the plaintiff in error was the Saginaw Beef Company. This company purchased some goods outright, while other products were shipped to it to be sold on a commission basis. The Saginaw Beef Company, through its employés, solicited various retail merchants between Alberta and Owosso, Mich., on the Ann Arbor Railroad, for orders which were later filled by plaintiff in error and billed to the Saginaw Beef Company. Plaintiff in error did not appear in the transactions between the Saginaw Beef Company and the retailer.

---

⮞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

When the territory had been covered and the orders secured, the Saginaw Beef Company sent its order to plaintiff in error. Shipments were made in carloads, routed Chicago to Owosso, Mich., via the Chicago & North Western Railroad to Manitowoc, thence via the car ferry operated by the Ann Arbor Railroad to Frankfort, Mich., thence by the Ann Arbor road to Owosso. It appears that four cars were thus shipped at different dates. The seals remained intact until the cars reached a distributing point in Michigan, where representatives of the Saginaw Beef Company boarded the car, and at each station where customers resided the meat was taken by these representatives and delivered to the retailer, or placed in the depot for the retailer. Plaintiff in error paid the freight charges upon the basis of carload shipments to Owosso.

James M. Sheean, of Chicago, Ill., for plaintiff in error.
Charles F. Clyne, of Chicago, Ill., and J. J. Hickey, for the United States.

Before BAKER, ALSCHULER, and EVANS, Circuit Judges.

EVAN A. EVANS, Circuit Judge (after stating the facts as above). Although several assignments of error are presented, only one need be considered. For it is admitted by both sides that the judgment cannot stand if the shipper was entitled to carload rates for each of the four shipments mentioned. Plaintiff in error admits that its right to carload rates is dependent upon certain rules appearing in the published tariff sheets of the Ann Arbor road in force at the time of the shipments; that, if these rules do not furnish support for the carload rate, then it obtained a reduced rate on each of its four shipments. The case therefore turns upon the construction and the application of these rules to the facts as stated.

[1] These rules appearing under the general head of "Charges for Stopping Cars in Transit to Complete Loading or Partly Unload" read as follows:

(A) Cars containing freight which is waybilled at carload rates will be stopped in transit to complete loading of car, or to partly unload contents of car (except as otherwise specifically provided).

(B) The charge for stopping off cars for the purpose of unloading a portion of the contents, or completing loads, will be $3 per car for each stop.

These rules obviously pertain to carload shipments. They deal with and recognize the rights of shippers who are shipping freight in carload lots. The first one may have been unusual, but it was conceded on the trial that it was on file with the Interstate Commerce Commission and was in force on the Ann Arbor line at the time of the shipments in question.

Nor can there be much dispute as to the meaning of the words "stop in transit to complete loading of car or to partly unload contents of car," as used in rule A, especially in view of the language "stop off cars in transit" adopted in rule B. If a shipper under these rules asked to have his car "stop off in transit" (put on a side track or left at a station to be taken by a later train), he was charged $3 for each such stop. If the shipper wished to take on freight to fill the car, or partly unload the car (there being no necessity for holding the car

for a later train), rule A governed, and no charge was made. Not only is this construction the only rational one, but it is in complete harmony with the understanding of the officials of the Ann Arbor road, as shown by their testimony, and it is in harmony with the practice of the road as carried on when shipments by other parties of a similar character were made.

[2] Had experts given testimony tending to dispute this construction, we think the shipper would still be bound only by a fair and reasonable construction of these rules. The correct rule of construction in a situation like this is announced in Newton Gum Co. v. C., B. & Q. R. R. Co., 16 Interst. Com. Com'n R. 346 as follows:

"The law compels carriers to publish and post their schedules of charges upon the theory that they will be informative. A shipper who consults them has a right to rely upon their obvious meaning. He cannot be charged with knowledge of the intention of the framers or the carrier's canons of construction or of some other tariff not even referred to in the one carrying the rate. The public posting of tariffs will be largely useless if the carrier's interpretation is to be dependent upon tradition and the arbitrary practices of a general freight office. * * *

"A classification sheet is put before the public for its information. It is supposed to be expressed in plain terms, so that the ordinary business man can understand it, and, in connection with the rate sheets, can determine for himself what he can be lawfully charged for transportation."

But it is claimed that these rules must yield to rule 11 of the Official Classification No. 38 which reads as follows:

"In no case will the charge for a consignment of freight (shipped at one time by one consignor to one consignee and destination) when loaded by shipper, on or in one car be greater when computed at actual or estimated weight and L. C. L. rate than on basis of C. L. rate and minimum carload weight; nor will the charge for a full carload when loaded by shipper be greater at C. L. rate and minimum carload weight than on basis of L. C. L. rate and actual or estimated weight."

By adding $3 for each stop to the carload rate the government contends that a rate greater than the L. C. L. charge was obtained, and therefore, under this last-quoted rule, the L. C. L. rate applied.

This position is well answered by referring to a rule governing Official Classification No. 38 and reading as follows:

"A tariff is not governed by a classification or exceptions thereto, except when and to the extent stated on the tariff."

Inasmuch as this classification rule was not set forth in the tariff sheets of the Ann Arbor Railroad from which quotation has been made, it cannot govern over a contrary rule therein appearing.

But a further reason for not applying this rule 11 of the Official Classification No. 38 lies in the fact that the shipper was not subject to a charge of $3 for every stop, and therefore the carload rates plus the charge for stopping did not in fact exceed the L. C. L. rate.

[3] We are also convinced that still another reason exists for not applying this rule to this case. The character of this shipment, or any freight shipment, must be determined at the time the shipment begins, and cannot be changed, so far as the application of rates is concerned, by the subsequent conduct of either the consignor or the con-

signee. Consignor's exercise of his right to stop a shipment in transit cannot relieve him of his obligation to pay the freight charges based upon the character of the shipment as it was originally begun. Nor would consignor's determination, after a shipment has begun, to handle the freight differently from what it was originally billed, change the character of the shipment.

The government further contends that the L. C. L. rate should have been applied because each carload shipment was not a single shipment, but in reality was from the plaintiff in error as consignor to the various retailers to whom the Saginaw Beef Company made sales as consignees. This appears to be the theory of the indictment, as each such shipment is made the basis of a separate count.

This theory totally ignores, not only the bill of lading, wherein but one consignee, the Saginaw Beef Company, is named, the undisputed testimony that plaintff in error was a stranger to the transactions between the retailer and the Beef Company, but it also ignores the two rules above quoted.

The right of plaintiff in error to ship fresh meats in carload lots from Chicago to Owosso or to intermediate points was affirmatively established on the trial by the introduction of freight tariff sheets, circulars of the Interstate Commerce Commission and the Official Classification in force at the time of the shipments. In fact, this right to make carload shipments between these points is fully conceded by the government.

This same documentary proof recognized, and in fact established, the shipper's right to the benefit of transit privileges on connecting lines. In other words, a shipper making a carload shipment from Chicago to Owosso was entitled to all the transit privileges which the tariff sheets of the Ann Arbor road permitted. Among these transit privileges was the shipper's right to stop in transit as defined in these two rules A and B.

[4] The shipment having lost none of its carload character by its various stops, the shipper was free to bill the car to one consignee to be delivered, when unloaded, to various parties. A shipper making shipments in carload lots has the right to bill to a single consignee though the contents of the car may be intended for different individuals. I. C. C. v. D., L. & W. R. R. Co., 220 U. S. 236, 31 Sup. Ct. 392, 55 L. Ed. 448.

It is finally claimed by the government that the character of the shipment should be determined by the fact that employés of the Ann Arbor road helped unload the freight and that inasmuch as carload shipments are unloaded by the consignee, an inference arises that the parties (the shipper and the carrier) intended the shipment as an L. C. L. shipment.

Ignoring for the moment the government's failure to show plaintiff in error had knowledge of this fact, we find from an examination of the evidence that the government's claim in this respect is not supported by the proof. In three of the cars at least, the consignee unloaded the cars unaided by the carrier's employés. In one car only is there an inference that the railroad employés helped the consignee

to unload the freight. It appears clearly that the consignee provided men to unload the cars; that it paid the passenger fares of these employés whose duty it was to handle the freight. If any assistance was given by the train brakeman, it was merely by way of accommodation, or perhaps to make possible an earlier departure from the station.

If any inference can be drawn from this record on this phase of the case, it must therefore be unfavorable to the government; for if local shipments were to be handled by the carrier, and only in case of carload shipments was the consignee required to handle the freight, what conclusion must we draw from the fact that the consignee provided two men to unload each car of freight?

But this contention is conclusively answered by further reference to the rules in question. Neither rule forbids an employé of the railroad from helping the shipper to unload the freight.

It follows, from what has been said, that plaintiff in error was entitled to a carload rate on each of its four shipments and the charges set forth in the indictment are unsupported by the evidence.

The judgment is reversed, and a new trial ordered.