**UNITED STATES ex rel. SONKEN–GAL-AMBA CORPORATION v. MISSOURI–KANSAS–TEXAS R. CO. et al.**

No. 9737.

District Court, W. D. Missouri, W. D.

June 15, 1937.

Ringolsky, Boatright & Jacobs, of Kansas City, Mo., for relator.

Ellison Neel, of Cooper, Neel, Kemp & Sutherland and George Mersereau, of Lathrop, Crane, Reynolds, Sawyer & Mersereau, both of Kansas City, Mo., for respondents.

REEVES, District Judge.

This proceeding is authorized by section 49, title 49 U.S.C.A., relating to the subject of transportation. Such section of the statute authorizes the issuance of a writ of mandamus in favor of a shipper so as to enable such shipper to obtain equal facilities for the transportation of his property with those given other shippers under similar conditions and for like traffic.

The relator is engaged in handling scrap iron and scrap steel and has been so engaged for many years. At the present time it has a large quantity of old scrap steel and scrap iron which it has tendered to the respondents for shipment. Such shipments have been refused by the respondents upon the ground that such material is not scrap iron and scrap steel within the tariff rates authorized by the Interstate Commerce Commission, but the same constitute secondhand material and should be given such classification.

The tariff rates upon the two classifications are quite different. A much larger rate is charged for secondhand material than for scrap iron or scrap steel, and in consequence it becomes a matter of great importance, both to the shipper and to the carrier.

There are two questions presented by the pleadings and by the testimony: (1) Whether the tariff rate on scrap iron or steel relates to such material as will give it a peculiar meaning and thus invoke the exclusive jurisdiction of the Interstate Commerce Commission for its clarification; and (2) whether upon the evidence it should be held that the material tendered for shipment is secondhand material, thereby possessing a recognized commercial value and against which a higher rate should be applied.

The material in question is made up for the most part of steel plates, obtained and assembled from the dismantling of numerous oil tanks in the oil fields of Oklahoma and elsewhere. Such tanks have been in use over a period of fifteen to twenty-five years. They were employed for storing crude mineral. oils. They have become obsolete both because of their age and long use and from the improved construction of modern tanks. Such obsolete and antiquated tanks were dismantled by cutting away the metal fastenings and then throwing or lowering the separate plates from the tops of the tanks to the ground. The dismantling process involved operations from the top of the tank downward. During the years that the material was employed in oil tanks it was exposed to the weather. When abandoned for newer types of storage tanks, the material was sold for junk or scrap steel.

There was evidence that, in a few instances, selected portions of the steel plates taken from dismantled tanks were refabricated and used in the construction of smaller tanks. The evidence was that this involved a high degree of selectivity and was disappointing because of the rust and corrosion of the plates, the extent of which not readily appearing upon casual inspection. The plates thus selected and used again in the construction of oil tanks constituted a negligible percentage of the total number of plates assembled from dismantled tanks. The evidence did not tend to disclose any commercial value in the use or the employment of the plates taken from dismantled tanks, save only as scrap steel.

The above questions will be discussed and further statement of facts, if pertinent, will be made in the course of this memorandum opinion.

■■■ 1. It is urged by the respondents that the tariff on scrap iron and scrap steel involves a peculiar meaning, and therefore the matter here in controversy must be determined alone and in the first instance by the Interstate Commerce Commission.

For the purpose of taking away any peculiarity of meaning, the Interstate Commerce Commission has clarified such tariff by the following apt and revealing words: "Rates on scrap iron or scrap steel apply only on pieces (separate or combined) of iron or steel having value for remelting purposes only."

The plates in question were employed in the construction of oil tanks and, upon the dismantling of the tanks, the pieces, or plates, were entirely separated from other pieces or plates and as tendered for shipment constituted separate pieces of steel. It does not appear to be of consequence that such pieces of steel were large or that they were in any particular shape. The interpretation of the Interstate Commerce Commission did not contemplate that such pieces should be mutilated or bent or twisted in order to constitute scrap steel. The Interstate Commerce Commission in promulgating its rules did not require this. It did say, however, that such pieces, in whatever shape or form they might be, should have "value for remelting purposes only."

The testimony was overwhelming that such plates thus taken from obsolete oil tanks, having been exposed to the weather for a long period of years, had no value whatever save for "remelting purposes." Counsel on both sides are agreed on the proposition that the value mentioned in the tariff rule meant a commercialized value.

The issue therefore made by the pleadings; as well as by the contentions of counsel, was the factual one as to whether the material tendered for shipment had a recognized commercial value. Such material did not have such value. The matter of interpreting the tariff rule was not involved. The Interstate Commerce Commission by its elucidation left for decision in case of controversy the sole question as to whether or not there was in fact a recognized commercial value other than for junk purposes. Upon the evidence, there was not.

This disposes of the first contention made by the respondents and attaches the jurisdiction of the court over the controversy. Furthermore, a decision of the first point practically disposes of the entire case.

■■ 2. A careful examination of the decisions of the Interstate Commerce Commission does not reveal support for the contention of the respondents. For instance, in Klotz Bros. v. Chesapeake & Ohio Ry. Co., 177 I.C.C. 557, loc.cit. 558, the Commission defined scrap iron as follows: "Scrap iron consists of old, worn-out, obsolete, broken, and cut iron or dismantled machinery, and parts thereof, entirely unfit for original use and having no commercial value except for remelting purposes."

In the instant case the so-called steel plates consist of old, rusted, corroded, obsolete, and dismantled parts from old and

antiquated tanks. While there was some testimony that the material taken from them had been used in a few instances to construct similar oil tanks of smaller capacity, yet this was done wholly as an emergent matter. It proved unsatisfactory. Great difficulty was experienced in finding suitable material even for a temporary tank. This is aside from the proposition that such emergent use did not give the material a recognized commercial value in its then condition. Unquestionably, every piece of scrap iron and scrap steel could be used in its then state for some purposes. Smaller portions may be, and have been, used as an anchor on small boats, and for other temporary uses. It would be a waste of time to enumerate all the uses that might be made of scrap iron or steel. This does not give such material a recognized commercial value, nor does it take it out of the classification of scrap iron and scrap steel, having a value only for remelting purposes.

The Cross Tie Case is wholly different from the facts involved here.

3. The testimony disclosed that the material in question has been hauled by the respondent carriers for the relator over a long period of years. However, the evidence showed that the tonnage heretofore was not as great as now. This arises from the fact that the storing of oil in steel tanks in the oil fields and at other storage places is a comparatively new thing. The first tanks were used in large numbers beginning fifteen to thirty years ago, and it became necessary to replace such tanks by the erection of others, probably larger in capacity and more modern in construction. This meant the abandonment of the older tanks and their scrapping for junk purposes. This occasioned a vast increase in the tonnage and greatly enhanced the business of the relator, who was engaged in the scrap iron or scrap steel or junk business.

All of this brought about a great increase of business, both for the shipper and for the carrier. It appears that the relator now has ready for shipment a very large tonnage and has tendered the same for shipment as scrap steel. A different and more favorable classification would inevitably bring to the carriers a great increase in their revenue. Correspondingly it would decrease the profits of relator.

The evidence is overwhelming that the relator is entitled to have this material shipped as scrap iron or scrap steel. Accordingly, a writ of mandamus should be and will be granted to compel the transportation of the material involved with such classification as to tariffs.

Counsel for relator will prepare and submit an appropriate journal entry.