**SONKEN–GALAMBA CORPORATION et al.**
**v. ATCHISON, T. & S. F. RY. CO. et al.**

No. 11998.

Circuit Court of Appeals, Eighth Circuit.

Jan. 8, 1942.

See, also, 27 F.Supp. 902; 30 F.Supp. 936; 36 F.Supp. 909.

William G. Boatright and Harry L. Jacobs, both of Kansas City, Mo. (Bernard L. Glover and Charles A. Whitebook, both of Kansas City, Mo., on the brief), for appellants.

R. S. Outlaw, of Chicago, Ill., E. A. Neel, of Kansas City, Mo., and Hobert Price, of Dallas, Tex. (Cyrus Crane, George J. Mersereau, and Dean Wood, all of Kansas City, Mo., Frank J. Wren, of Ft. Worth, Tex., R. S. Shapard and Robert G. Payne, both of Dallas, Tex., and C. S. Burg and Carl S. Hoffman, both of St. Louis, Mo., on the brief), for appellees.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

GARDNER, *Circuit Judge.*

This was an action brought by appellants as plaintiffs against appellees as defendants to recover damages on account of the alleged refusal of the defendant carriers to receive and transport at the rates applicable on scrap iron and scrap steel, certain plates or sheets from dismantled oil tanks, in violation of Sections 8 and 9 of the Interstate Commerce Act, 49 U.S.C.A. §§ 8 and 9. It was alleged that on or about December, 1936, and continuously thereafter, the defendants "deliberately, wrongfully and in violation of law and without legal justification refused to carry or permit to be carried said scrap iron and steel salvaged from said tanks at the scrap iron and steel rate and refused to carry or permit same to be carried under any circumstances unless plaintiffs would pay an exorbitant rate approximately three times greater than the scrap iron and steel rate, which rate so demanded was not only wrongful, unlawful and without legal justification but prohibitive in said business * * *."

The action was tried to the court without a jury and resulted in findings and judgment in favor of the defendants. There was no allegation charging discrimination nor the granting of any preference. The tariff provision involved reads as follows:

"Scrap iron, scrap steel, borings, filings or turnings (iron or steel), subject to Note 1, minimum weight 75,000 pounds.

"Note 1.—Rates on scrap iron or scrap steel apply only on pieces (separate or combined) of iron or steel having value for remelting purposes only."

The court found, among other things, that there was no conspiracy or agreement of any kind between the defendant carriers that plates from dismantled oil tanks tendered for shipment by plaintiffs would not be transported at the scrap iron or scrap steel rate; that there was not tendered by plaintiff to any defendant carrier any quantity of plates from dismantled oil tanks of as much as 75,000 pounds in weight, excepting tenders of material involved in three mandamus suits referred to in the findings; that the plates in question in a great number of instances were eaten into by corrosion, by rust, by exposure to the elements, and sometimes perforated by corrosion; that on the other hand in a great number of instances, the plates were not perforated nor deeply pitted nor materially corroded, and that, "It is impossible to determine from the evidence what percentage of all of plaintiffs' plates fell in the first of these classes and what percentage fell in the second of these classes;" that "Of the plates recovered from dismantled oil tanks, great quantities were remelted and were of value for remelting purposes only. Great quantities were used and were of value for purposes other than remelting: (a) for building oil tanks; (b) for constructing various kinds of storage receptacles; (c) for constructing feeding floors, building culverts, making runways, damming creeks; (d) for raw material (without remelting) for tools (chiefly an Oriental use). It is impossible from the evidence to determine what percentage of the whole mass of metal recovered and recoverable from oil tanks was or could be used and was of value for these other than remelting purposes."

The court also found that "Plaintiffs consistently and continuously represented that the plates they had recovered from dis-

mantled oil tanks were useful and of value for all purposes for which new plates could be used. They so advertised their plates in trade magazines, in periodicals and newspapers, in letters and orally."

As bearing on the issue that it had been adjudicated in various mandamus proceedings brought by the plaintiff Sonken-Galamba Corporation against various carriers that the materials involved in this suit should be carried at the scrap iron and scrap steel rate, the court found that,

"As to one particular quantity of plates tendered for shipment to the defendant Texas & Pacific Railway Company (and other railroads not now defendants) by plaintiff Sonken-Galamba Corporation, Sonken-Galamba Corporation brought a mandamus proceeding in the United States District Court for the Northern District of Texas to compel the railroads to carry the quantity so tendered at the scrap rate. Mandamus was granted. The shipment tendered was carried at the scrap rate. * * *

"As to another particular quantity of plates tendered for shipment to defendants Missouri-Kansas-Texas Railroad Company, The Atchison, Topeka & Santa Fe Railway Company, and The Missouri-Kansas-Texas Railroad Company of Texas * * * by Sonken-Galamba Corporation, Sonken-Galamba Corporation brought a mandamus proceeding in the United States District Court for the Western District of Missouri April 28, 1937. An alternative writ was granted on the same day and made peremptory July 2, 1937. [United States ex rel. Sonken-Galamba Corp. v. Missouri-Kansas-Texas R. Co., D.C.] 21 F.Supp. 931. The shipment tendered was carried at the scrap rate."

The court concluded as a matter of law on the facts as found that plaintiffs were not entitled to recover damages in any amount, and accordingly entered judgment dismissing their complaint on the merits.

Plaintiffs seek reversal on substantially the following grounds: (1) that the classification of the material involved in this suit had been previously adjudicated between the parties in the three mandamus suits, and hence, the court should have held as a matter of law that the materials described in this action fall within the classification of the scrap iron and steel tariff properly construed and applied; (2) that the evidence established the fact that the material constituted scrap within the meaning of that term as used in the applicable tariff; (3) that even under the trial court's view of the limited extent of estoppel, plaintiffs were entitled to judgment to the extent that the defendants had refused to carry the materials involved in the mandamus suits at the scrap rate; (4) plaintiffs were entitled to recover as damages all loss of profits, diminution in business and increased expense of doing business, naturally and proximately resulting from the refusal of defendants to carry the proffered materials at the scrap rate; (5) that the liability of the defendants is joint, they being joint tort feasors without regard to the amount or proportion of the amount of damages caused by each, and that conspiracy is not essential to joint liability.

If, as contended by plaintiffs, the defendants are estopped by the judgments entered in the mandamus suits, it will not be necessary to consider the testimony going to the character of the materials involved. This question was first raised by plaintiffs by motion for summary judgment under Rule 56 of the Rules of Civil Procedure for District Courts, 28 U.S.C.A. following section 723c. In denying this motion, Judge Otis filed an opinion (28 F.Supp. 456, 459), in which he, among other things, said:

"It was not the judgment of the court that The Railway Company should transport material similar to that immediately before the court as scrap iron or scrap steel, but that it should transport a particular aggregation (22,000 tons) 'of pieces torn from old, obsolete, abandoned, dismantled oil storage tanks * * * the material described in * * * petition and the evidence.' Not only was there not in the judgment any express command to The Railway Company touching similar material; but no such command was implied.

"Of course the judgment in the mandamus proceeding could not be broader and never was intended to be broader than the law upon which it was bottomed. The law was that the scrap iron or scrap steel rate should apply 'only on pieces (separate or combined) of iron or steel having value for remelting purposes only.' Obviously whether any given piece of iron or steel has value 'for remelting purposes only' depends upon its qualities and characteristics. And its qualities and characteristics must be ascertained by examination. That examination in the first instance is made by

the shipper, who determines whether he believes the piece of iron or steel offered for shipment has value 'for remelting purposes only.' The second examination is made by the carrier, which determines whether the piece has value 'for remelting purposes only.' Perhaps the shipper and carrier do not agree. The controversy may be submitted to the Interstate Commerce Commission. In that event the Commission will determine from examination whether the piece of iron or steel has 'value for remelting purposes only.' The controversy may be submitted to a court. In that event the court will determine whether the piece has 'value for remelting purposes only.' The jurisdiction of the court will be limited to the discharge of that judicial function. Certainly the court will not legislate. Compare Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150. The court will not say to the parties before it: 'Hereafter when this shipper submits to this carrier a piece of iron and steel and claims it has value for remelting purposes only, the carrier will not test it by the legislative standard—Does it have value for remelting purposes only?—but by this new standard: Is the piece similar to some other piece?; or by this other new standard: Was the piece taken from a disused, obsolete, oil tank?'

"In the mandamus proceeding the issue was: Do the pieces of iron and steel which were tendered for shipment have 'value for remelting purposes only.' The judgment could not be broader than the issue. The judgment necessarily referred to particular pieces. The judgment was not: a piece of steel taken from an oil tank, which is bent, whose rivet holes have been torn out, which has undergone internal chemical change from corrosion, electrolysis, and exposure to destructive fluids, is of 'value for remelting purposes only' and must be carried at the scrap iron and scrap steel rate."

In a memorandum opinion, 33 F.Supp. 814, 819, embodied with the court's findings and conclusions, Judge Otis, answering a contention that the unit to be considered in determining whether pieces of metal from dismantled oil tanks were of value for other than remelting purposes was not any single carload which was tendered for shipment, but the whole mass of such material available in the country, among other things said:

"The unit to be considered is not the whole mass of secondhand plates from dismantled oil tanks which might be available. When a carload of secondhand plates, exceeding 75,000 pounds in weight, is tendered to a railroad for transportation, that carload is the unit to be considered. That carload is to be distinguished from the great mass in the fields or as yet in tanks not dismantled. Upon that carload of plates labor has been expended,—in gathering them, in placing them for shipment, probably in grouping them according to sizes. Sand in the river bed is one thing; sand loaded in a car for shipment is a different thing.

"It must be determined from an inspection of the carload of plates tendered for shipment whether, at the place where it is tendered, the pieces of steel it contains are of value for other than remelting purposes. The tariff was intended to be applied in a practical fashion by laymen. It was not intended that before it was applied a nation wide study must be made, that it must be ascertained what amount of such material was available in the country, what the national demand for other than remelting purposes is and then what the national supply should be weighed against the national demand."

We are in accord with the views expressed in these two opinions. The issue to be determined and which was determined in the mandamus cases was whether the defendant carriers had refused to carry pieces of steel having value for remelting purposes only at the scrap rate. That issue upon the evidence submitted was determined in favor of the shipper. In passing it may be noted that comparatively little evidence was offered in each of the mandamus proceedings, while in the instant action for damages a great deal of testimony was submitted, reflected in the printed transcript of approximately 4,000 pages. The plaintiff Tank Corporation was not a party to either of the mandamus proceedings. The defendant Atchison, Topeka & Santa Fe Railway Company and the two Missouri-Kansas-Texas Companies were defendants in only one of the mandamus cases involving 22,000 tons of material found to be scrap. They are therefore not bound by the other mandamus judgments, nor as to any other material except that described in the complaint in that case. The Texas and Pacific Railway Com-

pany was a defendant in only one of the mandamus cases, that which was brought in Texas involving 2000-15000 tons of material, and it can not be bound by the other mandamus cases involving other material. There is no serious contention that the judgments of the courts in the mandamus cases were not obeyed. In any event, the plaintiffs had effective means of enforcing obedience to those judgments.

▮▮ The damages claimed in the instant case are not limited to the material that was accepted and carried by the defendants but to other and different materials, some of which were confessedly not owned by plaintiffs, but which it is claimed they could have purchased. Ordinarily, the estoppel of a judgment does not extend to matters not expressly adjudicated, except where there are necessary and inevitable inferences. In the case at bar damages are sought to be recovered for the alleged failure properly to classify and accept the materials involved in this action. The question of the proper classification of those materials was not determined in the mandamus suits. Cromwell v. Sac County, 94 U.S. 351, 24 L.Ed. 195; United Shoe Machinery Corp. v. United States of America, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708; Larsen v. Northland Transportation Co., 292 U.S. 20, 54 S.Ct. 584, 78 L.Ed. 1096; Prentis v. Atlantic Coast Line R. Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150; Glines et al. v. Henwood et al., 8 Cir., 103 F.2d 226; Macon, D. & S. R. Co. v. General Reduction Co., 5 Cir., 44 F.2d 499, 501.

What is said by the Circuit Court of Appeals of the Fifth Circuit in the last cited case is here apposite. It is there said: "In the case at bar the question was not whether fuller's earth ought to be hauled as clay, and at the same rate. That question had already been determined by the commission and answered in the negative, and a different and higher rate fixed for fuller's earth. The sole question is whether the material tendered is fuller's earth, a question on which the commission has no superior knowledge. It is also a question whose answer has no general importance, for it may arise as to each car tendered anywhere, and will depend on an examination of each shipment for itself."

We think the same rule applicable to the material involved in this litigation, and hence, it is necessary to consider the proof as to the character of that material.

▮▮ It was incumbent upon the plaintiffs to show that what was tendered to the defendant carriers for shipment was entitled to the scrap rate, and that the materials not acquired and tendered by it because of the alleged wrongful acts of the defendants were likewise entitled to the scrap rate. The court found from the evidence that great quantities of this material were used and were of value for purposes other than remelting. The court also found that it was not possible from the evidence to determine as a matter of fact what percentage of any given segregated collection of plaintiffs' plates was valuable for remelting purposes only. The findings of the trial court can not be disregarded nor set aside "unless clearly erroneous." Rule 52 (a), Rules of Civil Procedure. This finding is supported by abundant evidence. Plaintiffs themselves continuously represented that the plates they had recovered from dismantled oil tanks were useful for purposes other than remelting. The average price received was far in excess of the going market value of scrap iron. Large quantities of it were actually used for building oil tanks, storage receptacles, feeding floors, culverts, runways, and that sold in the Orient was used without remelting for the making of tools.

In Crancer v. Lowden, 8 Cir., 121 F.2d 645, 649, it was asserted that scrap iron rates were applicable on used pipe thread protectors. These articles had all been used and were being sent to a plant in St. Louis, where such of the articles as were not too badly damaged were repaired and reconditioned. The remainder was useless except for remelting. The usable articles and the bad ones were commingled and shipped in open cars. In the course of the opinion in that case, we said: "The argument is advanced that the finding should be set aside because there was no proof that the articles had a market or commercial value for any purpose other than for remelting. Appellants' evidence showed that these seven and a great many more carloads of pipe thread protectors were purchased by them for reconditioning purposes. There was substantial evidence that a fairly well established price existed for used pipe thread protectors in the territory where they were available. The finding was not clearly erroneous and hence it may not be set aside. Rule 52(a), Rules of Civil Procedure, 28 U.S.C.A. following

section 723c; Borserine v. Maryland Casualty Co., 8 Cir., 112 F.2d 409."

Responding to the contention that the purchase of the pipe thread protectors for the purpose of reconditioning and not for remelting did not change the character of the articles, we said:

"But evidence of the use for which the articles were purchased and the use to which they were actually put was properly considered in determining what they actually were. In addition to the evidence showing the purpose for which appellants purchased the articles and the use to which they were put, there is an abundance of testimony to the effect that the articles were used pipe thread protectors, having an established market value as such, as distinguished from mere scrap iron. * * *

"The evidence is uncontroverted that the major portion of each carload of the shipments involved were used pipe thread protecting rings and were shipped loose and commingled in the cars. As heretofore demonstrated the proof justified the classification of the major portion of each shipment as pipe thread fittings consisting of used iron pipe thread protecting rings and not as scrap iron having a value for remelting purposes only."

In Southern Scrap Material Co. v. New Orleans G. N. R. R. Co., 159 I. C. C. 266, the Interstate Commerce Commission ruled that scrap iron rates were not applicable to secondhand railway track rails as taken from the roadbed because they could be used for their original purpose.

■ In the instant case, a very substantial part of the material was purchased and used for purposes other than remelting. They commanded prices clearly in excess of the prevailing market price of scrap iron for remelting purposes. The commodity in mass is not susceptible of a positive classification because each tendered shipment must be subjected to the test as to whether it has a value for other than remelting purposes. Doubtless, the classification of most commodities for rate purposes is a simple matter because of the uniformity of the character of such commodities. Thus, the classification of wheat will not be affected by the purposes for which it is valuable nor the use for which it is intended.

We conclude that the finding of the court with reference to the character of the material involved was not clearly erroneous and it is therefore sustained.

■ It is, however, contended that plaintiffs were entitled to recover damages for the alleged wrongful refusal of the carriers to accept and transport the materials involved in the mandamus cases which were adjudged to be entitled to the scrap rate. The record indicates that this question was not urged upon the lower court until after the entry of its findings and judgment, when the plaintiffs interposed a motion to amend, withdraw and make additional findings of fact and conclusions of law. The court in denying the motion, filed a memorandum opinion, 34 F.Supp. 15, 16, in which it is, among other things, said: "One contention which was made in the argument in support of the motion to amend, withdraw and make additional findings, etc., calls for some brief discussion. The point was that although no damages were awarded plaintiffs, on the theory that they had sustained no damages, the findings of fact implied that the material involved in the mandamus suits (which courts determined should have been carried at the scrap rate) was not carried when tendered for transportation (although carried after the alternative writs were issued, if plaintiffs still asked transportation). The thought seems to be that there was a short period in which the transportation of this material (to the amount of 4,858 tons) was denied carriage after tender and that, at least in that connection, plaintiffs were damaged. The weakness in this contention is that the evidence shows that the delay in the transportation of any of the material here referred to, after it actually was tendered for shipment and before the alternative writs became effective, was altogether too little to justify finding of damages (if there was any showing of delay as to any carload actually tendered). Indeed it was over and over again asserted by counsel for plaintiffs during the trial that the institution of the mandamus proceedings was the tender of material for shipment. The institution of each proceeding was immediately followed by the alternative writ."

In their brief, counsel for plaintiff assert that, "For the purposes of this suit, it is accurate to say that the damage sustained by appellants occurred between December 16, 1936 and April 1, 1937." They also say that, "It is accordingly our contention that even under the trial court's own theory as to the scope of the estoppel created by the former judgments that he was bound to have allowed appellants their damages to the extent of the profits which could have been earned

by the application of the 4,868 tons to fill orders that were tendered, bound to have allowed the damages suffered in the loss of appellants' business associate and financial backer, Hickman-Williams, which loss is conclusively shown to have occurred early in January, 1937, and bound to have allowed the damages suffered by the increased cost of the Ramona and Neodesha tank farms which were offered for sale the last of January, 1937."

Ordinarily, the measure of damage for the wrongful refusal of a carrier to accept and transport freight is the difference between the market value of the commodity at the time it should have been transported and such value when actually delivered. The court made a finding of no damages. The evidence warranted the court in finding that the market for plaintiffs' materials was rising from the latter part of 1936 until July, 1937, so that there was no basis for claim of loss of market. As to the 4,868 tons which plaintiffs claim was a part of the identical material involved in the mandamus suits, there was a considerable period of time following the issuance of the writs of mandamus during which the market value was as high or higher than it had been at any time prior to the issuance of the mandamus writs. Plaintiffs' testimony indicates that the 4,868 tons were made up of two consignments, one of 570 tons located at Wink and Wickett, Texas, involved in the Fort Worth mandamus suits, and one of 4,298 tons, located at Ramona, Oklahoma, involved in the Kansas City mandamus suit. As to the 570 tons, it appeared that a representative of the carrier inspected the shipment at Wink, Texas, on March 16, for the purpose of determining its proper classification, but before he had made a report the plaintiff Sonken-Galamba Corporation, had already filed mandamus suit on March 17, 1937. Cars for loading were furnished as requested on March 24. The delay was negligible and there was no showing of loss of market. As to the 4,298 tons located at Ramona, Oklahoma, it appears affirmatively that this material was not purchased until April 23, 1937, almost a month after the termination of the period during which plaintiffs claim they suffered damages. It was not conceded by the defendants that this material was the identical material involved in the mandamus suit, and the trial court did not so find. Testimony with reference to the identity of this material is vague and indefinite, but if it be conceded that the proof might sustain a finding not made by the court that 4,868 tons of the material in controversy were on hand and involved in the mandamus suits, yet there is no substantial evidence that plaintiffs suffered any damages in connection with this material.

One of the elements of damage claimed is based on the allegation that Hickman-Williams withdrew their financial support from the Tank Corporation because of controversies between Sonken-Galamba Corporation and the carriers as to the applicable freight rate. Even if it might, by some stretch of the imagination, be conceded that the proof showed this to be a fact, there is no basis for assuming that the continued financial support of that concern would have resulted in benefits to the plaintiff. Neither is there any proof that plaintiffs because of the withdrawal of the support of this concern did not have sufficient capital to carry on its business. Under its agreement as proven, Hickman-Williams was not obliged to furnish any specific amount of money. It might at any time withdraw from the arrangement. The evidence did not compel a finding that plaintiffs lost the financial support of this concern because of any freight controversies between plaintiffs and the defendants between December 16, 1936 and April 1, 1937, or in fact at any other time, and we must assume in support of the judgment that the court considered the evidence insufficient to sustain such a finding. Whether or not plaintiffs would have realized profits from their business had there been no freight controversy with the defendants leads inevitably into the realm of conjecture and speculation.

Plaintiffs bottomed their claim for damages on account of the alleged loss of their financial supporter and loss of profits upon the broad claim that the defendants wrongfully refused to carry the mass of material in which they were dealing and all similar material which they might have procured, at the scrap rate, and not upon any claim that the defendants had refused to take the material involved in the mandamus suits. Referring first to the claimed damage on account of the loss of financial support, it is to be remembered that the freight controversy involved all of the class of material in which plaintiff was dealing. Except as to that material involved in the mandamus suits, the defendants, it now appears, were right in declining to accept and transport it at scrap rate. It cannot be determined from

the testimony whether the acts of the de-, fendants in rightly refusing to carry the great mass of materials involved or their alleged wrongful acts in declining to carry the small amount of material involved in the mandamus suits caused Hickman-Williams to withdraw their financial support. The uncertainty, conjecture and speculation is therefore not limited to the element of damages but to the proof that any wrongful act of the defendants caused the loss of plaintiffs' financial supporter. So, too, in the matter of loss of alleged profits, it cannot be determined that plaintiffs' alleged loss of profits was attributable to the alleged failure of the defendants to accept and transport the materials involved in the mandamus suits, rather than from their rightful refusal to accept and carry the great quantity of materials not involved in the mandamus suits.

We conclude that there is no basis for the claim that plaintiffs were entitled to recover damages for the alleged refusal of the defendants to carry the materials involved in the so-called mandamus suits at scrap iron rates.

In view of the conclusions we have reached on the issues considered, we deem it unnecessary to express our views on other questions discussed in the briefs of counsel. The judgment appealed from is therefore affirmed.