## SONKEN–GALAMBA CORPORATION v. UNION PAC. R. CO.

No. 2929.

Circuit Court of Appeals, Tenth Circuit.

Nov. 13, 1944.

Harry L. Jacobs, of Kansas City, Mo., for appellant.

O. B. Eidson, of Topeka, Kan., and N. E. Snyder, of Kansas City, Kan. (T. M. Lillard, of Topeka, Kan., on the brief), for appellee.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Appellee, the Union Pacific Railroad Company, as carrier, brought this suit to collect the difference between the prescribed freight rate on scrap iron (17c per hundred pounds), which had been charged and collected, and a higher freight rate applicable to steel plates (44c per hundred pounds), on four carloads of metal shipped over its railroad from Tulsa, Oklahoma, to Topeka, Kansas by appellant, Sonken-Galamba Corporation, and consigned to itself, there.

Based upon facts which are not materially in dispute, the trial court concluded that the metal thus shipped was not scrap iron, as defined in a note to the traffic regulations prescribing commodity rates for scrap iron and scrap steel in carload lots, which provides that "rates on scrap iron or steel apply only on pieces (separate or combined) of iron or steel having value for remelting purposes only." It accordingly gave judgment for the Railroad Company, and the shipper has appealed contending that the trial court's interpretation of the definition and application of the facts thereto is clearly erroneous.

Appellant is a scrap dealer located at Kansas City, Kansas, and its affiliate Sonken-Galamba Supply Company at Tulsa, Oklahoma, is engaged in handling scrap, selling steel plates, pipes, tanks and refinery equipment. Prior to 1939, the Sonken-Galamba Supply Company wrecked some oil storage tanks at Ramona, Oklahoma, the bottom plates of which were of a lighter grade of steel than the sides or ring plates, and due to the many years of use were rusted and pitted. From June 8 to September 11, 1939, appellant consigned four carloads of these tank bottom plates from Tulsa, Oklahoma to itself at Topeka, Kansas. They were "thrown loosely in an open car" without any blocking or dunnage, and were billed as "scrap iron." All of the metal thus shipped was sold by appellant to Henry Dietrich, a "junk dealer" in Topeka, Kansas, for $20 per net ton, F.O.B. Topeka. One car was retained by Dietrich and unloaded at his junk yard, where an undetermined part of it was sold to individuals for various uses, and the remainder sold for remelting purposes. Three of the carloads were sold to the Wentz Equipment Company at Topeka, manufacturers of road machinery, for $23 to $26 per ton, depending upon the quality of the material. 50 to 75% of the metal purchased by Wentz was used in the manufacture of sub-standard road culverts, sometimes called "junk culverts", and sold to the State, counties and municipalities as such—that which was unfit for culverts was sold by Wentz to scrap dealers.

The Wentz Equipment Company had previously purchased other tank bottoms from Dietrich and the Supply Company in Tulsa for use in the manufacture of substandard culverts and a "few" small storage tanks. It had also unsuccessfully attempted to use the tank bottoms in the manufacture of snow plows. Two or three of the Wentz Company's competitors in the vicinity had also used some of the tank bottoms in the manufacture of road culverts, but there was no other recognized market for the use of this material in the manufacture of finished products, and less

than 5% of these tank bottoms were sold for anything other than remelting purposes. During the period in which these shipments were made, 1,200 tons of this material was shipped directly to the mills for remelting purposes, and there was evidence to the effect that approximately 3% of all scrap iron is sold for purposes other than remelting.

■ Of course, we do not establish the tariff rate, nor do we judge its reasonableness, rather it is our limited province to apply the prescribed reasonable rate to the factual situation before us, and in so doing we are often required to legally interpret the definitions given us by the rate making and regulating authority. In the discharge of our limited responsibilities, we must not forget that tariffs and rates are promulgated and established for the use of laymen in the course of their business affairs, and the interpretation must be susceptible of practical and ready application. Sonn v. Magone, 159 U.S. 417, 16 S.Ct. 67, 40 L.Ed. 203; Sonken-Galamba Corporation v. Atchison, T. & S. F. R. Co., 8 Cir., 124 F.2d 952; Union Wire Rope Corporation v. Atchison T. & S. F. R. Co., 8 Cir., 66 F.2d 965.

The rate making and regulating authority has by apt and revealing words defined "scrap iron" as used in its prescribed tariff as that class of metal which has value for remelting purposes only, and it has amplified that definition by describing "scrap iron" as consisting of "old, worn-out, obsolete, broken, and cut iron, or dismantled machinery, and parts thereof, entirely unfit for original use and having no commercial value except for remelting purposes." Klotz Bros. v. Chesapeake & Ohio, 177 I. C. C. 557. See also 21 F. Supp. 931, affirmed 98 F.2d 457; Vol. 38, Words and Phrases, Perm. Ed., p. 364.

Making application of the definition to particular facts, the Commission has held that old boiler flues and tubes which were damaged and unfit for further use in the manufacture or repair of boilers, but which "after being cleaned, trimmed and otherwise reconditioned," could be utilized without remelting as pipe, fence posts, or other purposes, had a recognized commercial value other than the elementary metal from which they were manufactured, and were therefore not properly described as scrap iron. Schwartz v. St. Louis, San Francisco R. Co., 51 I. C. C. 145. In Chase Companies, Inc., v. Director General, 81 I. C.

C. 207, three carloads of cartridge-brass discs were held to have value for purposes other than remelting only, notwithstanding an agreement to the effect that they would be remelted while in the possession of the shipper, and would not be used for any purpose until they had been remelted. The Commission said that although the articles shipped were valuable to the shipper as scrap brass and for remelting purposes only, "it is the character of an article from a transportation standpoint, and not the use to which parties may contract that it shall be put, that determines the rate or rating applicable". See also Crancer v. Lowden, 8 Cir., 121 F.2d 645.

In Alaska Junk Co. v. Spokane, P. & S. R. Co., 98 I. C. C. 551, shipments of unused steel ship rivets and nuts, and washers which remained on hand at the shipyards after the building of steel ships was discontinued there, were held not to carry the scrap iron rate although thus billed, and were sold at scrap iron prices to be remelted only, since it was admitted that if there had been a market for the rivets, they would have been sold as such instead of scrap. The Commission again said value for remelting purposes only defines the nature of the article, and the rate to be applied is not dependent upon the use to which the articles are put. The Commission thought that these articles had a recognized commercial value and were therefore not properly within the description of scrap steel.

In Knight Iron & Metal Co. v. Gulf, M. & N. R. Co., 101 I. C. C. 623, ten carloads of iron bars, ranging in length from 10 to 27 feet, approximately 1 to 1½ inches in diameter, which had been used for reinforcing concrete in an old concrete ship, sold by the United States as scrap, were shipped from Mobile to Birmingham, Alabama, and billed as scrap iron. After arriving in Birmingham, the shipment was inspected by the Weighing and Inspection Bureau, and the original billing changed from scrap iron to iron bars by a representative of the Bureau on three of the carloads, and higher freight charges were assessed accordingly. The Commission granted reparation, holding that since the metal was originally billed as scrap iron and subsequently changed to iron bars by the carrier, the burden rested upon it to show that the shipments were not scrap and the evidence did not sustain that burden. In Pittsburgh Crushed Steel Co. v. Boston & Maine R.

Co., 140 I. C. C. 339, the materials shipped were refuse or screens from the manufacture of chilled-iron shot consisting of small pieces of chilled iron having no definite shape or form, and were useless for any purpose except remelting or conversion into another commodity. It was shipped in carload lots to the shipper's plant where it was crushed for use as an abrasive in the process of polishing marble and granite, and automobile bodies. The rate applicable to chilled shot was charged, and the Commission in granting the shipper a refund of the difference between the rate charged and the contemporaneously applicable scrap iron rate, said that the rule "in the classification limiting scrap iron to articles 'having value for remelting purposes only' defines the nature of the article but does not mean that they must actually be remelted. It is the nature of the article shipped and not the use which may subsequently be made of it which determines whether the scrap-iron rate apply".

This is not the first time appellant has been in court in cases involving a classification of this particular material under the same definition of "scrap iron", and these adjudicated cases have an important bearing upon the instant facts. In United States ex rel. Sonken-Galamba Corporation v. Missouri-Kansas-Texas R. Co., D. C., 21 F.Supp. 931, 932, this appellant brought suit in the Western District of Missouri to mandamus the carrier to accept "old, rusted, corroded [and] obsolete" parts of oil tanks which had been dismantled in the oil fields and tendered for shipment as scrap iron. There was evidence that in a few instances portions of the steel plates taken from the dismantled tanks had been refabricated and used in the construction of smaller tanks, but this process "involved a high degree of selectivity and was disappointing because of the rust and corrosion of the plates". The parties agreed that the word "value" as used in the definition meant a recognized commercial value, and the court held that the evidence was overwhelming to the effect that the material in question had no recognized commercial value whatever save for remelting purposes. The writ was granted to compel transportation of the metal involved under the classification of scrap iron as defined. The case was affirmed on the issue of fact, 8 Cir., 98 F.2d 457. See also Atchison T. & S. F. Ry. Co. v. United States ex rel. Sonken-Galamba Corp., 8 Cir., 106 F.2d 899.

Again in Texas & P. R. Co. v. Sonken-Galamba Corporation, 100 F.2d 158, the Fifth Circuit affirmed a writ of mandamus by the trial court, based upon a jury verdict to the effect that two thousand tons of corroded and pitted oil tanks which had been sold by the oil company as scrap, and had been dismantled and resold by the shipper as scrap, did not have a commercial value except for remelting purposes.

Fortified by these decisions, appellant brought a suit in the Western District of Missouri for damages alleged to have been caused by the refusal of the railroad companies to accept the material from dismantled oil tanks which it had tendered as scrap iron. Sonken-Galamba Corporation v. Atchison, T. & S. F. R. Co., D.C., 33 F. Supp. 814. At the conclusion of an exhaustive hearing, the trial court made detailed findings of fact in which it reviewed the course of the mandamus proceedings, including an unpublished mandamus proceedings in his court, wherein the writ had been granted on the grounds that the tendered shipments of dismantled oil tanks were scrap iron fit for remelting purposes only. The court found that the plaintiffs had acquired large quantities of oil tanks which were no longer useful as such to their owners in the oil fields, by reason of deterioration and obsolescence and by reason of the exhaustion of the particular oil fields where located; that the material tendered for shipment in the mandamus cases, and the case then on trial, consisted not only of the tank bottoms, as in our case, but all parts of the dismantled tanks, including those which were deeply pitted and sometimes perforated by corrosion, and those which although somewhat rusted and weather worn, were neither pitted nor corroded. The court could not determine from the evidence what percentage of the material fell in one class, and what percentage in the other. It did however specifically find from the evidence that great quantities were of value for remelting purposes only, and that great quantities were also of value for purposes other than remelting, such as building oil tanks, storage receptacles, feeding floors, building culverts, making runways, damming creeks, and that plaintiffs had consistently and continuously represented that the plates recovered from the dismantled tanks were useful and of value for purposes for which new plates could be used by advertising in trade magazines, newspapers and letters. The court then observed that the plaintiff was com-

pelled to recognize that immense quantities of the plates had been actually used and were of value for other than remelting purposes. But notwithstanding, the plaintiff contended that the whole mass of material available in the country should be considered as one unit in determining its character for rate purposes instead of considering a single carload which might be tendered for shipment at some given point, and that when thus considered in the light of the national demand and national market, the material had no recognized value save for remelting purposes. The trial court conceded that such was the theory upon which it had granted the writ of mandamus in a previous case, but that it was not convinced that "the unit to be considered is not the whole mass of dismantled oil tanks which might be available", but rather the contents and character of each carload tendered for shipment, apart from tanks not yet dismantled or tendered, was the only practical basis for the determination of whether the particular shipment falls within the definition. The court held that the plaintiff had failed to sustain the burden; that the material tendered for shipment was scrap iron as defined in the tariff, and denied damages for the refusal of the Railroad Company to accept it as such. On appeal, the case was affirmed in the language of the trial court. 8 Cir., 124 F.2d 952.

■ ■ From the foregoing analysis of the adjudicated cases, it is made plain that the nature and character of each shipment at the time tendered determines its status for rate purposes, and the use which may be subsequently made of the material does not control the question whether the shipment has a recognized commercial value save for remelting purposes. Neither does the nature of the general mass of material, to which the particular shipment may be related, control the question of its recognized commercial value for purposes other than remelting, Sonken-Galamba Corporation v. Atchison T. & S. F. R. Co., 124 F. 2d 952, but it is competent, we think, to consider whether in the light of the nature of the whole mass of the material, and the general use or uses to which it is put, a particular market for a given shipment constitutes a recognized commercial value or is merely isolated and sporadic in the sense that it should be ignored in the practical application of the facts to the definition. See Crancer v. Lowden, 8 Cir., 121 F.2d 645. Cf. Maddock v. Magone, 152 U.S. 368, 14 S.Ct. 588, 38 L.Ed. 482.

■ If the four carloads of material involved here had been consigned by the shipper to the mills and billed as scrap iron, there would be no question of their character or the applicable rate, and the fact that they were shipped to another junk dealer instead of to the mills does not change their character for rate purposes. Furthermore, if Dietrich had reconsigned the material to the mills at a profit, or had unloaded all of it in his junk yard and sold a small part for practical uses, there would be no question of its character for rate purposes. The question then is whether the fact that a part of the material was resold to a manufacturer who used some of it in the manufacture of substandard road culverts, and resold the balance as scrap, changes the character of the material from that which identified it at the time and place of its shipment. It is necessarily the predominate use or value which should determine the character of the shipment, and not the isolated and sporadic use to which it may sometimes be put after it has been shipped to its intended destination. Cf. Sonn v. Magone, 159 U.S. 417, 16 S.Ct. 67, 40 L.Ed. 203. Tariff rates cannot be applied retrospectively, neither can the character of the material be made to depend upon an independent investigation concerning its use after it has passed from the consignee of the shipper. Crancer v. Lowden, supra; Swift & Co. v. United States, 7 Cir., 255 F. 291.

■ The shipments in question were accepted by the carrier as scrap iron, and freight rates were assessed and collected accordingly. The burden is therefore upon the carrier to show that at the time the material was shipped, it had a recognized commercial value for purposes other than remelting. The trial court found as a fact that the material shipped had value for purposes other than remelting only, and based thereon reached the legal conclusion that the shipments were not "scrap iron" as defined in the tariff. Of course the findings of the court, if supported by substantial evidence, are conclusive here and its judgment thereon is also binding unless clearly erroneous. But the ultimate question of whether the shipments were properly classified under the tariff involves an application of the facts to the definition, and the conclusion to be drawn therefrom, is essentially a legal concept on which this

court must exercise its independent judgment. Sonn v. Magone, supra. In reaching our legal conclusions, we should be careful not to draw the circle so closely that every shipment of tank bottoms or scrap material would require a separate investigation as to the purposes for which it is to be used before ascertainment of the applicable tariff rate.

It should be noted that we are not dealing with whole tanks in their dismantled state as in Sonken-Galamba Corporation v. Atchison, T. & S. F. Ry. Co., 8 Cir., 124 F.2d 952, but only the pitted and corroded bottoms of those tanks, and the findings of fact in relation to recognized commercial value in that case is not an accurate criterion for the instant facts. The evidence in this case supports the conclusion that there was a limited market for some of these tank bottoms and to that extent they had value for purposes other than remelting, but the evidence is also conclusive that only about 5% of this particular class of material was used for any purpose other than remelting. Thus it is clear from the evidence that predominantly the only value attributable to these tank bottoms was for remelting purposes only and the judgment is reversed accordingly.