STRICKLAND TRANSPORTATION COMPANY, Inc., Plaintiff,

v.

LING–TEMCO–VOUGHT, INC., Defendant.

Civ. A. No. 3–63–139.

United States District Court
N. D. Texas,
Dallas Division.

Nov. 4, 1963.

Ralph W. Currie, of Muse, Currie & Kohen, Dallas, Tex., for plaintiff.

George B. Davis, Dallas, Tex., for defendant.

ESTES, Chief Judge.

This suit is one to recover an alleged deficit in freight charges on a number of shipments of the commodity hereinafter described.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Findings of Fact

1. The Court finds that each such shipment was transported in interstate commerce in the common carrier motor carrier service of the plaintiff. Each was delivered to the defendant, the named consignee, who received them.

2. The proper freight charge for this commodity depends upon the "rating" assigned to it under the terms and provisions of the National Motor Freight Classification Nos. A–5, A–6 and A–7. These instruments are tariffs published by the plaintiff and filed with the Interstate Commerce Commission pursuant to the requirements of the Interstate Commerce Act, Part II. No. A–6 superseded No. A–5 on December 21, 1961. No. A–7 became effective September 6, 1963. So far as here pertinent, however, there is no difference among the three.

3. The term "rating" as used herein means the percentage, or multiple, of the first-class rate assigned to each article offered for transportation. The function of the National Motor Freight Classification is to describe, as nearly as possible, each and every article which might be offered for transportation and to assign a rating to each such article. A rating of 85, for example, means that the freight charge for such article is to be computed on the basis of 85% of the first-class rate. The first-class rate is published in a table, stated in terms of cents per one hundred pounds, and varying with the distance a shipment is to move. To determine the "rate" on a shipment carrying a rating of 85, for a given distance, 85% of the first-class rate for that distance is calculated: The "charge" is obtained by multiplying the rate thus obtained by the number of hundredweights there are in the shipment.

4. The dispute here is confined to the rating which should be assigned to the commodity actually transported. This, in turn, depends upon which item in the National Motor Freight Classification most aptly describes the commodity.

5. Plaintiff contends that the commodity is best described by Item 11820 of the National Motor Freight Classification, which reads as follows:

> "AIRCRAFT OR PARTS NAMED:
>
> Aircraft Skins (outer covering), metal, in boxes or crates: In flat shapes."

This Item carries a rating of 85 for less-truckload quantities (LTL) and 50 for truckloads (TL).

6. Defendant contends that the commodity is best described by Item 13100, Item 13260 and Item 13262 of the Classification, which read as follows:

Item 13100: "ALUMINUM:"

Item 13260: "Blanks, stampings or unfinished shapes, NOI, nested or flat, see Note, item 13262."

Item 13262: "Note Applies only on articles consisting of one piece of metal, requiring additional work to be performed on them to bring them to their final shape. Painting, buffing, polishing or plating or similar finishing operations are not considered to be such additional work. Articles not requiring such additional work to bring them to their final shape must be rated under the specific or general description provided therefor; in the absence of such a specific or general provision, the ratings for Aluminum Articles, NOI, are applicable. Articles may be painted or otherwise coated for preservation or protective purposes only."

This item carries a rating of 60 LTL and 45 TL.

7. No other description is suggested by the parties, and the Court finds none other that would be applicable.

8. The Court finds as a fact that the commodity is made of aluminum, is composed of a single piece and is flat in shape.

9. The Court finds that when the commodity was tendered to the plaintiff for transportation to the defendant, it had already gone through a manufacturing process; that this manufacturing process was specifically designed to make of it an aircraft skin, or metal covering for an airplane. So far has this manufacturing process gone that, when the commodity was shipped to defendant, it had no utility except that for which it was expressly designed: an aircraft skin or metal covering for an airplane.

10. The Court finds that the article is taken from the shipping crate, brought directly to an inspector and is placed on a sawhorse. A master templin is placed over the top of the article and held in place by the use of a bolt which drops through two tab holes which are then on the article as shipped. This templin is made of heavy marble board, is in the same shape as the article. The object of placing the templin over it is to determine whether the article corresponds precisely with the templin. If it does, it is accepted. If it does not, it is rejected. If it is rejected, it is normally scrapped. If it is accepted, it is placed in stock.

11. After the acceptance, as above stated, the article is first removed to another floor where the grease is taken off and an identifying stencil applied. It is then returned to the shop floor for the final work to be done on it.

12. The first thing that is done is to cut off the aluminum metal which contains the tab holes. These two tabs are rectangular in shape, with rounded corners, of dimensions approximately 4½ inches by 2½ inches. These are thrown away.

13. The next thing that is done is to fasten the article to a master jig or frame and then to begin the process of drilling holes in it. These holes are several hundred in number, and after the holes are drilled they are reamed out so that the rivet head will be below the surface of the metal.

14. This hole drilling (which has to be precisely done) is the only work that is done on the article except for removing of the grease, the stencilling, and the cutting off of the tabs as above stated.

15. The Court finds that prior to the movement of the shipments here involved, the National Motor Freight Classification was amended by adding thereto the item which plaintiff contends is the applicable one. The purpose and intent of such addition was to describe the commodity here involved.

16. The Court finds, based on all the evidence, that Item 11820, above quoted, does, in truth, best describe the commodity here involved. Such item carries a rating of column 85, LTL & 50 TL, and that there is a difference of $3,562.18 between the charges calculated in accordance with such ratings and the charges actually paid by the defendant.

*Conclusions of Law*

The Court concludes as a matter of law:

1. This suit is one which arises under an Act of Congress regulating commerce, to wit, the Interstate Commerce Act. This Court has jurisdiction regardless of the amount involved. 28 U.S.C. § 1337.

2. The law peremptorily fixes as charges to be exacted for the carriage of freight those specified in the applicable tariff, no more and no less. Thus, no receiver of freight may free the goods of the carrier's lien unless he discharges not what may appear to be, or be asserted to be, but what actually is the amount due thereon, which amount such receiver and the carriers are conclusively presumed to know. Western Grain Co. v. St. Louis-San Francisco Railway Co. (C.A.5,1932), 56 F.2d 160, 162 and cases cited.

3. The interpretation of a freight tariff presents ordinarily a question of law which does not differ in character from that presented when the con-

struction of any other document is in dispute. Great Northern R. v. Merchants Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 66 L.Ed. 943.

 4. In the interpretation of a tariff where two possible ratings are suggested to be applied on a given commodity, the more specific rating, that is, the one which more precisely describes and better fits the shipment in question is the controlling rating. United States v. Strickland Transportation Co., Inc. (C.A. 5,1953), 200 F.2d 234, 235 and cases cited in footnote 4.

5. While the Interstate Commerce Commission has held that it is not permissible to make different ratings upon the same article based wholly on different uses to which the same article may be put, and while the Commission in many cases has declared that the use to which the commodity is put is not determinative of the applicable rate, it is equally well settled that the use may be considered in determining the nature of the commodity. Wisconsin Waste & Wiper Co. v. Chicago & Northwestern Ry. Co., et al., 196 I.C.C. 459, 460.

The nature and character of the shipment at the time tendered for transportation determines its status for rate purposes. Necessarily, the predominant use or value is the use or value which should determine the character of the shipment. Sonken-Galamba Corporation v. Union Pac. R. Co. (C.A.10,1944), 145 F.2d 808, 812. The Commission has frequently found that the description of a commodity for sales purposes fixes its identity for transportation purposes. Freight Transportation Engineers, Inc. v. Cincinnati N. O. & T. P. Ry. Co. (1945), 262 I.C.C. 410, 412. Where, as here, an article is expressly designed for a single purpose, a description of that article couched in terms of such single purpose or use is an apt and appropriate description of the article itself.

6. The proper tariff description of the commodity actually transported in this case is that contained in the Item 11820 of the National Motor Freight Classifica-

tion heretofore quoted in finding of fact No. 5. The proper ratings are column 85 in less than truckload quantities and column 50 in truckload quantities.

7. When the charges are calculated in accordance with the rating provided in item 11820, above, there exists a freight charge deficit of $3,562.18, for which the defendant is legally liable to the plaintiff.

8. Judgment should, therefore, go in favor of the plaintiff for $3,562.18, with interest thereon at the rate of 6% per annum from this date until paid, together with all costs of court.