**NORTHWESTERN AUTO PARTS COMPANY, Appellant,**

v.

**CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellee.**

**NORTHWESTERN AUTO PARTS COMPANY, Appellant,**

v.

**CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY, Appellee.**

**NORTHWESTERN AUTO PARTS COMPANY, Appellant,**

v.

**GREAT NORTHERN RAILWAY COMPANY, Appellee.**

**NORTHWESTERN AUTO PARTS COMPANY, Appellant,**

v.

**MINNEAPOLIS & ST. LOUIS RAILWAY COMPANY, Appellee.**

Nos. 15611–15614.

United States Court of Appeals
Eighth Circuit.
Jan. 17, 1957.

Rehearing Denied March 4, 1957.

**744**

Sidney S. Feinberg, Minneapolis, Minn. (Robins, Davis & Lyons, Minneapolis, Minn., were with him on the brief), for appellant.

Gene F. Bennett, Minneapolis, Minn., and Harry S. Stearns, Jr., St. Paul, Minn. (Edwin C. Matthias, Anthony Kane, Robert W. Cronon, St. Paul, Minn., Richard Musenbrock, William J. Powell, L. C. Corcoran and Stuart W. Rider, Jr., Minneapolis, Minn., were with him on the brief), for appellees.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

These actions were brought by appellant against the several named railroads, appellees herein, to recover alleged freight overcharges collected from appellant in connection with various carload shipments transported by the several carriers and delivered to the appellant at Minneapolis. Each particular appellee was sued on account of each shipment delivered by it.

The plaintiff alleged in the first count of its complaint against defendant Chicago, Milwaukee, St. Paul & Pacific Railroad Company that the court had jurisdiction under Title 28 U.S.C.A. § 1337, and that on or about October 19, 1953, there was consigned to plaintiff at Minneapolis, Minnesota, from Mira Loma, California, a carload shipment of scrap iron or steel and that said shipment was transported by various carriers in car No. UP 22983 and was delivered to the plaintiff by defendant. That the lawful freight charge, including tax, for the transportation of said car of scrap iron or steel was in the amount of $833.00, but that the defendant demanded and received of the plaintiff $2040.00 on account thereof. That by reason of the facts alleged, defendant is indebted to plaintiff in the amount of $1207.00.

The complaint contained five similar counts, each alleging a shipment of scrap iron or steel, a lawful freight charge of a certain amount, and an overcharge. The prayer was for $3,562.73 with interest.

The defendants, admitting federal jurisdiction, answered that the shipments referred to in the complaint were respectively of "tractor treads, old, used, having value only for reconditioning," or "auto parts, engine parts, and parts other than body parts, having value for reconditioning only," and that the charges made and collected were in accord with the lawful published and filed tariffs, rules, regulations, classifications and schedules of rates and charges required by the Act of Congress entitled "An act to regulate commerce," passed February 4, 1887, 49 U.S.C.A. § 1 et seq.

For the purpose of a motion for summary judgment for defendant, a stipulation of facts was entered into and filed as follows:

"Stipulation of Facts.

"It Is Hereby Stipulated and Agreed by and between the parties hereto through their respective attorneys that for the sole purpose of defendants' Motion for Summary Judgment, the following facts may be accepted as true and correct; and in the event that said Motion is de-

nied, it is understood that none of said statements in this Stipulation shall be binding upon any of the parties nor shall in any way be construed as an admission against them.

"1. The general nature of plaintiff's business includes the handling of parts for obsolete vehicles, such as Army vehicles which are no longer being manufactured. It purchases new and used parts surpluses from the Government and companies that are scrapped or obsolete in their stocks and tries to merchandise them. Such purchases are brought to a yard maintained in Minneapolis. Shipments are loaded at point of purchase with no attempt at sorting or segregation. Upon arrival at Minneapolis the shipments are unloaded and certain portions of each shipment are scrapped upon arrival. The balance of such shipments are stored for future disposition either through scrapping or reconditioning. Plaintiff does not have facilities for smelting and whenever any part of a shipment is scrapped, whether upon arrival or at a later date, the same is sold to scrap jobbers.

"2. The shipments involved in the pleadings were purchased from the United States Army as the result of published lists of material by the Government which were obsolete and overstocked on behalf of the Government or which, because of condition, were no longer of useful service. The material is listed only by general description and purchases are made on the basis of competitive bids submitted by prospective purchasers. Bids submitted by plaintiff are on a tonnage or poundage basis in competition with regular scrap iron and steel dealers and are usually slightly higher than the then prevailing market price of scrap, except that on some occasions it would be substantially higher.

"3. Said shipments were purchased from the Army for the pur-pose of movement to the yard of plaintiff in Minneapolis. It was the intention of plaintiff to recondition and sell as automotive parts so much of each shipment as might become economically feasible and practical. After the shipments have been stored, there are periodic checks at irregular intervals and additional amounts are scrapped. Substantial amounts of parts have the physical capacity to be reconditioned, but the following factors will determine from time to time the decision as to whether to recondition or scrap:

(a) Anticipated market for reselling.

(b) Receipt of order for particular parts.

(c) Economic cost of reconditioning.

(d) Sufficiency of reserve capital.

(e) Condition of the scrap market.

(f) Amount of plaintiff's storage space.

(g) Physical condition of the parts.

(h) Size of stock of particular parts on hand.

"4. All of the units in said shipments maintain their original identity at the time of shipment and ultimately are either scrapped or reconditioned for sale as automotive parts. Many of the units upon arrival in Minneapolis are so rusty and worn, or otherwise unfit for use, as to make it impractical economically to recondition them.

"5. Plaintiff has no records to establish with accuracy the quantity of each shipment which has been sold for scrap or which has been reconditioned and sold as automotive parts. The balance of such shipments on hand in plaintiff's storage yard is being kept by plaintiff awaiting future decision as to what shall be scrapped and what shall be reconditioned and sold. Plaintiff's experience in similar shipments

over the years is such that on the average approximately ten per cent (10%) of shipments are reconditioned and sold as automotive parts and ninety per cent (90%) are eventually sold for scrap.

"6. Originally, similar shipments moved by rail from point of purchase by plaintiff to its yard at Minneapolis under the classification of 'Scrap, Auto Parts.' Later, other similar shipments were reclassified at 85% Scrap Iron and Steel and 15% Used Auto Parts for reconditioning purposes only. In some instances involved herein the material was described in the Bills of Lading as 'auto parts and engine parts, old, used, having value for reconditioning.' In other instances the material was originally described as 'scrap iron, etc.,' but as to the latter shipments, the defendant railroads changed the Bills of Lading to read 'auto parts and engine parts, old, used, having value for reconditioning.' In every case plaintiff paid the higher rate based on the latter classification and this action seeks recovery of the difference between the rate paid and the lower rate applicable to 'scrap iron, etc.'

"It Is Hereby Stipulated and Agreed by and between the parties hereto that defendants' Motion for Summary Judgment may be submitted to the Court herein; and in the event that the Court or either party wished oral argument, the parties will stipulate to a time and place at the Court's convenience for submission of said argument; and that upon the filing of said Motion, defendants shall have seven (7) days in which to submit a written brief and plaintiff shall have seven (7) days in which to answer said brief. Defendants shall then have three (3) days in which to reply to plaintiff's brief."

Defendants' motion was in general terms for summary judgment in each of the actions "upon the files and proceedings" and "on the stipulation of facts" and was submitted to the court on briefs and oral argument. The judgments sustaining the motion in each of the actions and summarily dismissing each action was accompanied by the opinion of the court published at D.C., 139 F. Supp. 521. The actions were consolidated for purposes of appeal.

■■■■■ The position of the plaintiff-appellant is that the trial court erred in granting summary judgment and the only contention it presents for reversal is that there was a genuine issue of fact in each of the cases on which plaintiff was entitled to trial. It argues that "if this case had been submitted to the trial court on the same stipulation of facts, not on a Motion for Summary Judgment, but for the determination of all issues by the Court, the appellant might well concede that there was a basis for the conclusion which the Court reached." It cites the settled law, fully recognized by this court, that under Rule 56(c), Federal Rules of Civil Procedure, 28 U.S. C.A., a summary judgment upon motion therefor by a defendant should never be entered except where the defendant is entitled to its allowance beyond all doubt; only where the conceded facts show defendant's right with such clarity as to leave no room for controversy; with all reasonable doubts touching the existence of a genuine issue as to a material fact resolved against the movant; giving the benefit of all reasonable inferences that may reasonably be drawn from the evidence to the party moved against. "That one reasonably may surmise that the plaintiff is unlikely to prevail upon a trial, is not a sufficient basis for refusing him his day in court with respect to issues which are not shown to be sham, frivolous, or so unsubstantial that it would obviously be futile to try them." Sprague v. Vogt, 8 Cir., 150 F. 2d 795, 801; Traylor v. Black, Sivalls & Bryson, Inc., 8 Cir., 189 F.2d 213; Union Transfer Co. v. Riss & Co., 8 Cir., 218 F.2d 553; Caylor v. Virden, 8 Cir., 217 F.2d 739.

When we turn to the pleadings, stipulation of facts, and the decision brought here for review, it must be observed that the controversy is in a field that has been productive of considerable litigation. The courts and the Interstate Commerce Commission have been required to decide whether shipments involved in cases before them were "scrap iron or steel" or were within some other classification for freight rate purposes in a number of cases. The decisions establish as a firm principle that it is the nature and character of a shipment at the point and time of origin that determines whether or not it is scrap iron or steel for rate purposes, and both parties here concede that point citing Larrimore, Inc., v. Union Pacific R. R. Co., 273 I.C.C. 415, and Sonken-Galamba Corporation v. Union Pacific R. Co., 10 Cir., 145 F.2d 808. The recognition of that principle does not, however, foreclose all honest controversy as to what the "nature and character" of a particular shipment is for the fixing of rates.

It appeared to the trial court that the only question for decision was whether the tariff Item was applicable to the shipments. It held the nature and character of the shipment involved here were shown to have been other than scrap iron or steel by the agreed facts as a matter of law, and it stated, among the elements controlling decision, that the "plaintiff has no records to establish with accuracy the quantity of each shipment which has been sold for scrap or which has been reconditioned and sold as automotive parts." And that "there was no separation of parts at the time of shipment, and that upon arrival in Minneapolis, some of the parts are immediately scrapped, but substantial amounts are stored to be disposed of later." And "the failure of plaintiff to keep records as to the disposition of the parts makes it impossible to determine with any accuracy how many of the parts were actually scrap, even assuming that such records would be competent to show the nature and character of the au-

tomotive parts at the time of shipment." The court also observed, "Even assuming that some of the parts were scrap under any definition, although the Court does not now pass upon this question, it does not appear that a court or jury could determine what amount was scrap without entering into the realm of speculation and conjecture." The court "concluded, as a matter of law, that the tariff classification for scrap iron and steel is inapplicable to the automotive parts shipped by plaintiff." Cf. 139 F.Supp. at pages 524, 525.

The appellant has concentrated its attack against the above summary judgment on the court's conclusion that plaintiff could not make proof of its claims. It is argued for appellant that the court was not justified in asserting that court or jury "could not determine what amount was scrap without entering into the realm of speculation and conjecture." It points out that in the main case relied on by the parties and the court, Sonken-Galamba, 10 Cir., 145 F.2d 808, supra, the plaintiff, claiming to be obligated only for freight charges for scrap, was granted reversal of a judgment charging it with the rates applicable to "steel plates." Although circumstances analogous to those noted here were present, in that the shipments of "tank bottom plates" there involved were "thrown loosely in an open car" and no record appears to have been kept as to the condition of any of the pieces at the time, both the trial court and the appellate court were able to and did make findings as to the nature and character of the shipment. The trial court found "that the shipments were not scrap iron as defined in the tariff", and the appellate court said [145 F.2d 813], "the evidence is also conclusive that only about 5% of this particular class of material was used for any purpose other than remelting. Thus it is clear from the evidence that predominantly the only value attributable to these tank bottoms was for remelting purposes only."

Likewise in Crancer v. Lowden, 8 Cir., 121 F.2d 645, 648, and Atchison, T. & S.

F. Ry. Co. v. United States ex rel. Sonken-Galamba Corp., 98 F.2d 457, 458, decided by this court, where the question was whether or not the material shipped was scrap iron or steel, there is no reference to any record made at the time of the shipment to distinguish between the character and nature of parts of the material. In the first case the court said of the shipments: "The articles were shipped in open coal cars. The good and the bad were commingled, were loose in the cars * * * ;" and in the second, the court referred to "these plates, derived from dismantled tanks." Yet the question whether the material was or was not scrap was deemed to be justiciable, and was decided on the evidence adduced.

The appellant insists that it can make proof, notwithstanding the admissions of the stipulation, that will entitle it to at least some recovery for overcharge on its shipments, and that its claim is made in good faith in full view of the authoritative precedents and is not sham or frivolous or unsubstantial.

It does not specify the testimony which it intends to adduce at a trial, but it may be inferred that it would attempt to support the general allegations of its complaint by evidence that the high cost of screening the pieces of the shipment that are fit for reconditioning, and handling them, and the small percentage that will be found fit for or that will ever be applied to any use except remelting, leaves small value in the shipments except for remelting. In argument it also stresses that scrap dealers were the competitors in the bidding at which plaintiff bought the pieces in the shipment from the government as indicating that the pieces shipped were treated as scrap by those informed.

But when we consider the generality of the complaint and of the motion for summary judgment, and then the particulars of the stipulation on which the judgment was rested, and the reasoning of the court, it appears that the two different matters of construing the tariff

and passing on the question of reasonableness have been treated as one.

It may well be that if the words of the tariff defining scrap iron or steel as "having value for remelting purposes only" are to be applied as absolute and so strictly as to preclude any margin of tolerance, then the stipulation that "substantial amounts of parts have physical capacity to be reconditioned," and that on competitive sales they brought "slightly higher and on occasion substantially higher bids than prevailing market prices of scrap," and "all of the units * * * maintain their original identity," and "are either scrapped or reconditioned for sale as automotive parts" would compel the conclusion, ruling and judgment complained of.

But manifestly, the plaintiff's position is that if the tariff should be so construed and applied to these shipments, it would be unreasonable and violative of the intent of the Act. The broad pleading that the proper rate was a certain sum (which was the rate for scrap) left it open to the plaintiff to so contend. But it appeared to the trial court that no question could be presented as to the reasonableness of the rates charged. The court said: "That is not within our province. * * * The sole issue is as to the nature of the material shipped for rate purposes. This is the only issue the court is empowered to decide. See Sonken-Galamba Corp. v. Union Pacific R. Co., * * *." 139 F. Supp. at page 523.

After the submission of this case to the trial court and the submission of the appeal to this court, the Supreme Court rendered decisions on December 3, 1956, in United States v. Western Pacific Railroad Co., 77 S.Ct. 161, and United States v. Chesapeake and Ohio Railway Co., 77 S.Ct. 172, which deal directly with the determination of disputed transportation charges by railroads.

In the first case, railroads sued in the Court of Claims to recover from the United States, as shipper, the difference between tariff rates actually paid and those allegedly due on Army shipments

of steel aerial bomb cases filled with napalm gel (i. e., gasoline thickened with aluminum soap powder) to which burster and fuse had not yet been added. The shipments were billed as "incendiary bombs" but the General Accounting Office made deductions on the ground that the shipments should have been carried at the lower rate applicable to "gasoline in steel drums." In answer to the railroad's suit for the difference, the government contended that the absence of burster and fuse deprived the bombs of the essential characteristic of incendiary bombs, and if the tariff item was allowed to govern, it would be unreasonable as to the shipments and as to that issue the court proceedings should be suspended and the matter referred to the Interstate Commerce Commission.

The Court of Claims had held on motion for summary judgment that the shipments were incendiary bombs entitled to the higher rate. It assumed, as did the district court in this case, that whether the higher rate applied was a matter simply of tariff construction. It regarded reasonableness of the tariff, as applied to the shipments, as within the initial competence of the Interstate Commerce Commission, but held that the running of the two year period of limitations, provided by sec. 16(3) of the Interstate Commerce Act, cut off the right of referral to the Commission.

The Supreme Court of its own motion announced its conclusion that in the circumstances of the case "the question of tariff construction, as well as that of the reasonableness of the tariff as applied, was within the exclusive primary jurisdiction of the Interstate Commerce Commission." The Court developed at length in the opinion the doctrine of primary jurisdiction and the reasons for it citing the precedents, and declared that where the questions of construction of a tariff and its reasonableness are so intertwined that the same factors are determinative on both issues, then it is the Commission which must first pass on them.

 The problem of deciding in this case whether plaintiff's shipments were "scrap iron or steel having value for remelting purposes only" involves many of the same considerations expressed by the Supreme Court in regard to the problem in the Western Pacific case. The record here gives us no inkling of the factors that produce the scrap iron rates or the rate on "automotive engine parts other than automobile bodies, old, used, having value for reconditioning," or what it is that justifies the difference between the rates. All that the Supreme Court said in the Western Pacific case [77 S.Ct. 165] as to the necessity for "expert and specialized knowledge" in that case is applicable here, and it must be held here in accord with the teaching of the Western Pacific case that the question of the tariff construction, as well as that of the reasonableness of the tariff as applied, are within the exclusive primary jurisdiction of the Interstate Commerce Commission.

In the other case decided on December 3, United States v. Chesapeake & Ohio Railway Company, the question was whether certain shipments by the United States took the export rate which was lower or the domestic rate which was higher. The Court said that it faced the same question as that dealt with in the Western Pacific case, namely: "does the issue of tariff construction, which the Court of Appeals regarded as one for the court, involve such acquaintance with rate-making and transportation factors as to make the issue initially one for the Interstate Commerce Commission, under the doctrine of primary jurisdiction?" [77 S.Ct. 174.] The decision followed United States v. Western Pacific R. Co. and the case was remanded to the Court of Appeals.

As to the Statute of Limitations.

 49 U.S.C.A. § 16(3) (c) provides that complaints against carriers for overcharges shall be filed with the Commission within two years from the time the cause of action accrues, and not after, and there is no doubt in this case that the time has elapsed within

which the plaintiff in this case could bring an original proceeding for recovery of the alleged overcharges by way of reparation before the Commission. But as declared by the Supreme Court in the Western Pacific case, supra, "Section 16(3) does not deal with referral of questions to the Commission incident to judicial proceedings." This action was brought in the district court within the two year period, section 16(3) (b), and at that time there was reason to believe that it could be maintained without recourse to the Interstate Commerce Commission.

We think it must be held under the two Supreme Court decisions of December 3, 1956, and the decision of this court in United States v. Kansas City Southern Ry. Co., 217 F.2d 763, that section 16 does not bar referral of the controversy to the Interstate Commerce Commission.

In the three controlling cases the government was party defendant owing to the power it has through the General Accounting Office to deduct its claims against its debtors from amounts it owes them, and to that extent the ruling that Section 16(3) did not bar the proceedings before the Interstate Commerce Commission sanctioned in the three cases might be distinguished from a referral of this case to the primary jurisdiction of that body. But we infer from the following expressions of the opinion of the Supreme Court in the Western Pacific case that inasmuch as the litigation in this case is not stale, no issue in it can be deemed stale, and the statute of limitations does not bar the referral. The Court said:

"We may assume, without deciding, that the Government would have been barred by § 16(3) from filing an affirmative suit before the Commission to recover overcharges from a carrier. Nevertheless we do not think that the statute operates to bar reference to the Commission of questions raised by way of defense in suits which are themselves timely brought. Respondents in effect ask us to hold that a suit

may be brought for six years but that certain defenses thereto may be raised only for two years. Only the clearest congressional language could force us to a result which would allow a carrier to recover unreasonable charges with impunity merely by waiting two years before filing suit.

"Section 16(3) does not deal with referral of questions to the Commission incident to judicial proceedings. On its face it has to do only with the commencement of actions or reparation proceedings before the Commission. There is therefore no language which militates against the conclusion that the statute does not apply to referrals. More important, the basic policy behind statutes of limitations has no relevance to the situation here. The purpose of such statutes is to keep stale litigation out of the courts. They are aimed at lawsuits, not at the consideration of particular issues in lawsuits. Here the action was already in court and held to have been brought in time. To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation. We think it would be incongruous to hold that once a lawsuit is properly before the court, decision must be made without consideration of all the issues in the case and without the benefit of all the applicable law. If this litigation is not stale, then no issue in it can be deemed stale."

The judgment appealed from and the ruling on the motion for summary judgment are reversed and the case is remanded with direction to refer the controversy as to the alleged overcharges to the Interstate Commerce Commission and retain jurisdiction of the case pending proceedings before that body.

Reversed and remanded with directions.